OREGON R. & NAVIGATION CO. v. CAMPBELL et al.

(Circuit Court, D. Oregon. September 28, 1909.)

No. 3,308.

1. COURTS (§ 289*)—JURISDICTION OF FEDERAL COURTS—FEDERAL QUESTIONS.
    A suit to enjoin the enforcement of railroad rates established by state authority, on the ground that the act and order establishing the same are an interference with interstate commerce and that they are unreasonable and confiscatory, presents federal questions, which give a federal court

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

jurisdiction, regardless of whether complainant's position is in fact maintainable.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 830; Dec. Dig. § 289.*

Jurisdiction in cases involving federal question, see notes to Bailey v. Mosher, 11 C. C. A. 308; Montana, Ore-Purchasing Co. v. Boston & M. Consol. Copper & Silver Min. Co., 35 C. C. A. 7.]

**2. CONSTITUTIONAL LAW (§§ 60, 80\*)—DISTRIBUTION OF GOVERNMENTAL POWERS—VALIDITY OF OREGON STATUTE CREATING RAILROAD COMMISSION.**

The railroad commission act of Oregon of February 18, 1907 (Laws 1907, p. 67), which requires every railroad to charge reasonable and just rates, creates a state railroad commission, with power to determine in the first instance the reasonableness of rates charged, and, if found unreasonable, to fix rates which shall be prima facie reasonable and just, and shall be conformed to by the railroad company, with the right, however, to bring suit in a court of the state to determine their reasonableness, in which suit it shall have the burden of proof, is not unconstitutional, as conferring legislative, executive, and judicial functions on the commission, in violation of article 3, § 1, of the state Constitution, providing that the powers of government shall be divided into three separate departments, legislative, executive, and judicial, and that, except as provided in the Constitution itself, no person charged with official duties under one of these departments is competent to exercise any function of the other.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 89, 144; Dec. Dig. §§ 60, 80.*]

**3. CONSTITUTIONAL LAW (§ 50\*)—DISTRIBUTION OF GOVERNMENTAL POWERS—VALIDITY OF STATUTE.**

In the constitutional division of the powers of a state into legislative, executive, and judicial departments, there can be no absolute line of demarcation between the functions of such departments, and where it is scarcely ascertainable whether the several powers conferred by a statute belong more properly to one or the other department, and their assignment to one works no practical encroachment on the functions of another, the fact that all such powers are vested in a single body or tribunal for practical reasons will not invalidate the statute.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 48; Dec. Dig. § 50.*]

**4. COMMERCE (§ 61\*)—CHARGES BY CARRIERS—STATE REGULATION—CONSTITUTIONALITY OF OREGON STATUTE.**

The railroad commission act of Oregon of February 18, 1907 (Laws 1907, p. 67), by its terms is unmistakably limited to the regulation of carriers and rates between points within the state, and an order made by the state railroad commission under its authority is presumptively intended to be subject to the same limitation. The fact that such an order, fixing rates, and limited by its terms to intrastate shipments, may incidentally induce a change in the movement of interstate commerce, or a change in interstate rates, does not render it, nor the statute, unconstitutional as a regulation of interstate commerce.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 82; Dec. Dig. § 61.*]

**5. CONSTITUTIONAL LAW (§ 242\*)—EQUAL PROTECTION OF LAWS.**

The railroad commission act of Oregon of February 18, 1907 (Laws 1907, p. 67), which creates a state railroad commission, with power by order to fix reasonable rates to be charged by any railroad company, provides that the company, if dissatisfied with such rates, may bring suit in a state court to set aside the order, on the ground that the rates fixed thereby are unlawful, and may procure an injunction suspending the order by giving a bond conditioned that it "shall answer for all damages

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

caused by the delay in the enforcement of the order * * * and all penalties that would attach against the said railroad and all compensation for whatever sums, for transportation service any person or corporation shall be compelled to pay in excess of the sums such person or corporations would have been compelled to pay if the order * * * had not been suspended." The only penalties to which the company or its officers or agents could in any event be subjected by reason of obtaining such injunction in a suit brought in the prescribed court, or in any other court, state or federal, would be one of from $100 to $10,000, imposed on the company by the act for failure or refusal "to obey any lawful * * * order made by the commission." *Held,* that the act was not unconstitutional, as subjecting a railroad company to such excessive penalties for its violation, or in case it resorted to the courts, as to deny it the equal protection of the laws.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 703; Dec. Dig. § 247.*]

**6. CARRIERS (§ 12*)—REGULATION OF RATES—REASONABLENESS.**

A bill by a railroad company to enjoin the enforcement of an order of a state railroad commission, fixing rates to be charged by it, *held* not to state facts showing that the rates so fixed were unreasonably low or confiscatory.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 11; Dec. Dig. § 12.*]

In Equity. Suit by the Oregon Railroad & Navigation Company against Thomas K. Campbell, Clyde B. Aitchison, Oswald West, and A. M. Crawford. On demurrer to bill and motion for preliminary injunction. Demurrer sustained, and injunction denied.

This is a suit to restrain the Oregon State Board of Railroad Commissioners from putting into operation and effect a schedule of rates for carrying freight upon and along the complainant's lines of railroad in Oregon. The Attorney General of the state is joined as a party defendant. The complainant is the owner of, and has now in operation, a system of railroad lines in Oregon, Washington, and Idaho, extending from Portland, Or., to Huntington, and from Umatilla and Pendleton, Or., to Spokane, Wash., and Wallace, Idaho, together with numerous branch lines, extending from the main line of the system. This system of railroads has connection with other systems extending elsewhere, in other states than those named, wherewith joint traffic is maintained. The bill of complaint attacks the validity of the act of the Legislative Assembly of the state of Oregon, adopted February 18, 1907 (Laws 1907, p. 67), in pursuance of which the State Railroad Commission was created and its powers were conferred, upon the ground that it is unconstitutional and void, within the limitations of the state Constitution, and that its operation is to deprive the complainant of its property and services without due process of law, contrary to the federal Constitution. The act is, by exhibit, set out in full. Under the act it is made the duty of the Attorney General to enforce the provisions thereof and to prosecute any violation of its mandates.

More specifically, it is alleged that the complainant has physical connection with the Oregon Short Line and the Union Pacific Railways, and these have a like connection with various lines of railroad owned and operated by the Chicago & Northwestern Railway Company, the Chicago, Rock Island & Pacific Railway Company, and the Chicago, Milwaukee & St. Paul Railway Company, and that, by reason of these connections, and through tariffs published and established by the various companies concerned, merchandise and commodities of all kinds have moved from Chicago, Milwaukee, Duluth, St. Paul, Minneapolis, St. Louis, and points and places located upon the east of the Missouri river, to Portland, and to places east of The Dalles reached by the lines of the complainant; that the Union Pacific, the Oregon Short Line,

and the complainant issued a tariff, designated "U. P. R. R. I. C. C. No. 1,578," covering the transportation of freight between the points named and Missouri river common points to various stations on complainant's line east of The Dalles, other than the station at Pendleton, Or., which was duly filed with the Interstate Commerce Commission, and became operative January 2, 1904, and is in effect and operation, with some amendments, at the present time; that the complainant and various other companies promulgated a tariff, naming class and commodity rates, effective January 18, 1904, from New York and common points, and from Pittsburg, Chicago, and Mississippi and Missouri river common points, to certain North Pacific Coast terminals, including Portland, Or., and designated "Transcontinental Freight Bureau No. 4—C," better known as the "Transcontinental Terminal Tariff"; that the complainant has now in effect and operation upon its lines a freight tariff, naming class and commodity rates, based upon the existing Western Classification, between Portland, East Portland, Albina, and St. Johns, Or., and all stations on its lines in Oregon, Washington, and Idaho, which tariff became effective January 1, 1907, and is designated "No. L—525, I. C. C. No. 1,146"; that complainant and the San Francisco & Portland Steamship Company, which latter company is now engaged in operating a line of steamers between Portland and San Francisco, have heretofore issued, and have now in operation, a joint freight tariff between San Francisco, Cal., and Portland and points on complainant's lines in Oregon east of The Dalles, which is designated "O. R. & N. I. C. C. No. 967"; that the rates so fixed and established are made up by adding certain arbitraries or local rates to the rates fixed and established by tariff No. L—525 from Portland to various points and places in Oregon east of The Dalles; that the Southern Pacific Company, the railway lines of which have physical connection with the lines of complainant, and complainant, have adopted, and have now in operation and effect, a joint tariff covering transportation from San Francisco and other points in California, to Portland, Or., and to all points in Oregon east of The Dalles, which tariff is designated "Southern Pacific I. C. C. No. 2,130"; that the through rates from California to points east of The Dalles in Oregon consist mainly of a combination of the rates fixed by tariff No. L—525 from Portland to such points east of The Dalles and certain arbitraries or local rates; that, under date of April 22, 1908, the Railroad Commission of Oregon made and entered an order, in a proceeding instituted before said commission by the Portland Chamber of Commerce against the complainant, which was served upon complainant on April 23, 1908, and was to become effective 20 days thereafter; that in and by said order it was found and declared, among other things, that the class rates now in effect under tariff No. L—525, with supplements amendatory thereto, over and upon complainant's main, branch, leased, and otherwise controlled lines in Oregon, between the city of Portland and all points in Oregon east of The Dalles, were and are unjust and unreasonably high, and complainant was directed to desist from charging any higher rates for transportation between points designated than the class rates prescribed by said order, and that, in lieu of said class rates established by said tariff No. L—525, the complainant should substitute and adopt the class rates specified in said order, which were and are, as it relates to all points east of The Dalles, greatly less than the rates established by tariff L—525 covering the same points; that at least 70 per cent. of the traffic carried, and hereafter to be carried, from Portland to points on complainant's lines east of The Dalles in Oregon, under the rates fixed by tariff No. L—525, originates, and will originate, at points along or east of the Missouri river, or in California, and is and will be first transported to Portland, and from thence under the class rates of L—525, or under the class rates fixed by the order of the Railroad Commission of Oregon, and that large quantities of like kind of goods are transported directly from the East to points in Oregon east of The Dalles, by complainant and allied lines, at and under the rates fixed by Union Pacific tariff No. 1,578, and from points in California to points in Oregon east of The Dalles at rates fixed and established by tariffs in force from California to points in Oregon east of The Dalles, as alleged; that by Union Pacific tariff No. 1,578 it is provided that, where the rate from the point of shipment added to the local rate under L—525 from Portland to points east of The Dalles is lower

than the through rate under said tariff No. 1,578, the combination rate shall
govern; that the tariff rates fixed by tariff No. 1,578 applying to points on
complainant's lines in Oregon east of The Dalles, and particularly the class
rates, are generally higher than the combination rates, and that the com-
modity rates fixed by such tariff No. 1,578 are generally somewhat less than
than the combination of the transcontinental terminal to Portland added to
the tariff under L—525, but that such commodity rates so fixed by tariff No.
1,578 are greater than the combination transcontinental and the rates fixed
by the Railroad Commission to said points east of The Dalles; that, should
the Railroad Commission's order become operative, it would affect, not only
the interstate rates specifically mentioned, but each and every other inter-
state rate now in force and effect from the Missouri river common points and
points east thereof to points in Oregon east of The Dalles, and from points
in California to like points in Oregon; that the said order of said Railroad
Commission necessarily amounts to an attempted regulation of commerce be-
tween the several states; that, should complainant attempt to comply with
the order, it would be compelled to violate the act of Congress and the regula-
tions promulgated by the Interstate Commerce Commission, and in this par-
ticular said order is an attempt to regulate interstate commerce, and is void;
that the rates established by tariff L—525 are lower than the rates estab-
lished for the transportation of similar traffic from any point on complain-
ant's lines other than Portland to any other point on complainant's lines in
Oregon, Washington, or Idaho, and the rates established by said tariff No.
L—525, from Portland to points east of The Dalles, are lower than the
rates charged by any other railroad company in Oregon, Washington, or
Idaho, for the transportation of similar traffic for the same distance; that the
rates attempted to be established by the said order are lower than the rates
fixed and established by said tariff No. L—525, and are unreasonably low,
and are unjust to complainant; that, while the immediate effect of such
order, if it could be confined strictly to the state of Oregon, might leave com-
plainant a fair income upon its entire business, nevertheless, if the rates at-
tempted to be established by the said order be applied to the interstate busi-
ness directly affected thereby, and if the percentage of reduction effected by
such order be applied to the local business of complainant in the states of
Oregon, Washington, and Idaho, which local business is now being transacted
upon rates higher than those fixed by tariff L—525, it will operate to con-
fiscate the property of complainant and deprive it of property without due
process of law, in violation of the Constitution of the United States, because
such reduction will leave complainant without any fair net earnings upon its
property; that the rates charged by complainant between Portland and The
Dalles, as established by L—525, are unreasonably low, made so by reason
of water competition; that by the order of the Railroad Commission the
rates to points east of The Dalles are based upon the rates charged by com-
plainant between Portland and The Dalles, and the rate of increase of the
rates to points east of The Dalles fixed by said order is unreasonably low and
unjust to complainant, and has the effect of making the rate to points east
of The Dalles unreasonably low, and to some points east of The Dalles less
than the rates to The Dalles, and therefore the order has provided that the
rates to points east of The Dalles shall equal the present rates to The Dalles
when the application of the formula prescribed would reduce the rates below
the present rates between Portland and The Dalles; that the application of
the present rates between Portland and The Dalles to points beyond The
Dalles renders them unreasonably low and unjust to complainant; that the
said order of the Railroad Commission fixes the rates upon complainant's
branch lines the same for equal distances as upon its main line, but that the
cost of service upon said branch lines, and each of them, is much greater than
upon the main line, so that the rates fixed by said order upon complainant's
branch lines are unreasonably low; that, by operation of the said order, com-
plainant will be permitted to charge but 2 cents more for hauling from Port-
land to Baker City than from Portland to La Grande, upon first-class freight,
1 cent more upon second, third, fourth, fifth, A, and B classes, and nothing
additional upon C, D, and E classes, but that a difference is made in the rates
to La Grande, as compared with the rates to Pendleton, of from 5 to 25 cents

173 F.—61

per 100 pounds upon the various classes, and a difference in the rates to Pendleton, as compared with the rates to Umatilla, of from 3 to 15 cents per 100 pounds; that such adjustment of rates is arbitrary and unreasonable, and is founded upon no circumstance and condition affecting the cost and value of service.

It is furthermore charged in the bill that no adequate or proper remedy is afforded for the protection of complainant against the alleged injustice of the tariff fixed by the order of the State Railroad Commission, and that the penalties prescribed for violation of the order are so severe and drastic as to render it confiscatory for complainant to attempt to litigate against an order, or to maintain its rights and have reasonable rates established affecting traffic upon its lines. Further, that the act of the Legislative Assembly of the state of Oregon creating said Railroad Commission is unconstitutional, for that it attempts to accord to said commission all the powers of government, namely, legislative, executive, and judicial. Coupled with all these charges is the usual averment that the commission and the Attorney General are threatening to put the tariff established by the commission into effect, and to prosecute complainant for any disregard of the provisions thereof. A preliminary injunction is sought, and, finally, a decree declaring such state railroad commission act to be unconstitutional and void, in so far as it may affect the complainant.

The order of the Railroad Commission is as follows:

"It is therefore ordered, considered, and determined that the defendant company, the Oregon Railroad & Navigation Company, shall cease and desist from charging any higher rates within this state for the transportation of merchandise and other commodities from the city of Portland to points on the defendant company's main, branch, leased, or otherwise controlled railroad lines within the state of Oregon, covered by the class rates in said tariff No. L—525, O. R. C. No. 39, I. C. C. No. 1,146, than the class rates prescribed in this order, and the said railroad company, in lieu of the rates herein ordered discontinued, shall substitute the following maximum rates: Reduce first-class rates from Portland to all points east of The Dalles, except where, under the existing tariff, the rates are now less than prescribed herein, by an amount equal to one-sixth of the difference between twenty-five cents (the existing first-class rate to The Dalles) and the existing first-class rate to such point, and reduce all other class rates between Portland and points east of The Dalles, with the exception above noted, so that it will bear the same relation to the first-class rate as is provided in the distance tariff of the said defendant railroad company, to wit:

| | Classes. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | A | B | C | D | E |

Per cent. of first class....100  85  70  60  50  50  40  30  25  20

"It is further ordered, considered, and determined, that the rates under the existing tariff shall not be exceeded on any class to any points covered by said tariff, nor to apply to or change any rate now in effect that is lower than the rates prescribed by this order. The rates prescribed by the foregoing order shall be effective on and after the ——— day of ———, 1908, and the defendant company is given until the ——— day of ———, 1908, to prepare and file new tariffs in accordance with the provisions of this order. It is recommended that the defendant railroad company make a similar adjustment of its distance tariff and its tariffs on various staple commodities, such as grain, wool, and other commodities, within the state of Oregon."

The controlling provisions of the state railroad commission act, in so far as they may pertain to this controversy, are in substance as follows:

It creates a Railroad Commission, to be composed of three persons elected by the people, but appointive until an election is held. Section 1.

The commission is given power to adopt and promulgate rules and orders to govern its proceedings, and to amend the same, and to regulate the mode and manner of all investigations and hearings of railroads and other parties before it. Section 9.

The term "railroad" is defined to embrace "all corporations, companies, individuals, associations of individuals," etc., "that now, or may hereafter, own, operate by steam, electric, or other motive power, manage, or control

any railroad or interurban railroad, or part of a railroad or interurban railroad, as a common carrier in this state." And the provisions of the act are made to apply to the transportation of passengers and property, and to all railroad companies, etc., "that shall do business as common carriers upon or over any line of railroad within this state." Section 11.

Every railroad is required to furnish reasonably adequate service, equipment, and facilities, and the charges made for the services rendered are also required to be reasonable and just. Every unjust and unreasonable charge for such services is prohibited and declared to be unlawful. Section 12.

Every railroad is required to print and file with the commission a schedule of its rates and joint rates existing between all points in the state upon its lines, or any line controlled or operated by it. Section 13.

Changes in schedules are to be made only upon notice and filing of copies of new schedules with the commission. Section 14.

"It shall be unlawful for any railroad to charge, demand, collect or receive a greater or less compensation for the transportation of passengers or property or for any service in connection therewith than is specified in such printed schedules, including schedules of joint rates, as may at the time be in force, and the rates, fares and charges named therein shall be the lawful rates, fares and charges until the same are changed as herein provided." Section 16.

But one classification of freight shall exist in the state, which shall be uniform on all railroads. Section 20.

Upon complaint that any rates, fares, charges, or classifications are in any respect unreasonable or unjust, the commission may, upon 10 days' notice to the railroad company complained against, proceed to investigate the same. If, upon such investigation, the rates, fares, charges, or classifications shall be found to be unreasonable, the commission is empowered to fix and order substituted therefor such rates, fares, charges, or classifications as it shall have determined to be just and reasonable. The commission may also proceed upon its own initiative as upon complaint by an individual, company, or corporation. Section 28.

Whenever, upon an investigation made under the provisions of the act, the commission shall find any existing rates, fares, charges, or classifications, etc., unreasonable or unjustly discriminatory, it shall determine, and by order fix, reasonable rates, fares, charges, or classifications to be imposed, observed, and followed in the future, in lieu of those found to be unreasonable, and it shall cause a certified copy of such order to be delivered to an officer or station agent of the railroad affected thereby, which order shall, of its own force, take effect and become operative 20 days after the service thereof. All railways to which the order applies shall make such changes in their schedule on file as may be necessary to make the same conform to said order, and no change shall thereafter be made by any railroad in any such rates, fares, or charges without the approval of the commission. Section 30.

"All rates, fares, charges, classifications, and joint rates fixed by the commission shall be in force and shall be prima facie lawful, and all regulations, practices, and service prescribed by the commission shall be in force and shall be prima facie reasonable, until finally found otherwise in an action brought for that purpose pursuant to the provisions of sections 32, 33, 34, and 35 of this act." Section 31.

Any railroad feeling aggrieved by the acts of the commission in fixing or regulating rates and fares may commence suit in the circuit court of Marion county against the commission to vacate and set aside its order relating thereto, on the ground that the rates and charges so fixed are unlawful. The commission is required to answer within 10 days after service of the complaint upon it, and thereupon the cause is deemed at issue, and shall stand ready for trial upon 10 days' notice by either party. All suits brought under this section shall be tried and determined as causes in equity, and shall have precedence over any civil cause of a different nature pending in said court, which court shall always be deemed open for the trial of such controversies. The burden of proof is cast upon the complainant in trials arising under this section and sections 33, 34, and 35, to show, by clear and satisfactory evidence,

that the order of the commission complained of is unlawful or unreasonable. Section 32.

"No injunction shall issue suspending or staying any order of the commission except upon application to the circuit court or presiding judge thereof, notice to the commission, and hearing, and upon the giving of such bond or other security and upon such conditions as the court may require; and if such order of injunction suspends the order or requirement of the commission fixing rates, then the court shall require a bond with good and sufficient surety conditioned that the railroad or railroads applying for such injunction shall answer for all damages caused by the delay in the enforcement of the order of the commission and all penalties that would attach against the said railroad and all compensation for whatever sums for transportation service any person or corporation shall be compelled to pay in excess of the sums such person or corporation would have been compelled to pay if the order of the commission had not been suspended; and such bond shall cover the periods transpiring from time of the issuance of any such injunction until the final determination of the question litigated. The said bond shall be executed in favor of the Railroad Commission of Oregon for the benefit of whom it may concern and shall be enforceable by said commission or any person interested in an appropriate proceeding. Any person paying charges found to be excessive shall have a claim for the excess, whether paid under protest or not, and unless refunded within thirty days after written demand made after final judgment, may recover the same by action against such railroad, or such railroad and the sureties on such bond. Claims of persons for money collected in excess of the amount payable under the rate or rates established by the commission shall be assignable in the same manner as any chose in action. No appeal to the Supreme Court shall stay the operation of any order of the commission unless the circuit or Supreme Court shall so direct, and unless the railroad so appealing shall give a bond with like conditions and terms as that given on granting injunctions suspending an order of the commission fixing rates." Section 33.

"If, upon the trial of such suit, evidence shall be introduced by the plaintiff which is found by the court to be different from that offered upon the hearing before the commission or additional thereto, the court before proceeding to render judgment, unless the parties to such suit stipulate in writing to the contrary, shall transmit a copy of such evidence to the commission and shall stay further proceedings in said action for fifteen days from the date of such transmission. Upon the receipt of such evidence the commission shall consider the same, and may alter, modify, amend or rescind its order relating to such rate or rates, fares, charges, classification, joint rate or rates, regulation, practice, service or equipment complained of in said action, and shall report its action thereon to said court within ten days from the receipt of such evidence. If the commission shall rescind its order complained of, the suit shall be dismissed; if it shall alter, modify or amend the same, such altered, modified or amended order shall take the place of the original order complained of, and judgment or decree shall be rendered thereon, as though made by the commission in the first instance. If the original order shall not be rescinded or changed by the commission, judgment shall be rendered upon such original order." Section 34.

"Either party to said suit, within sixty days after the entry of the judgment or decree of the circuit court, may appeal to the Supreme Court. Where an appeal is taken the cause shall, on the return of the papers to the Supreme Court, be immediately placed on the calendar of the then pending term, and shall be assigned and brought to a hearing in the same manner as other causes on the calendar, but shall have precedence over civil causes of a different nature pending in said court." Section 35.

"The commission shall have power, and it is hereby made its duty to investigate all freight rates on interstate traffic on railroads in this state, and when the same are, in the opinion of the commission, excessive or discriminatory or are levied or laid in violation of the interstate commerce law, or in conflict with the rulings, orders or regulations of the Interstate Commerce Commission, the commission shall present the facts to the railroad, with a request to make such changes as the commission may advise, and if such

changes are not made within a reasonable time the commission shall apply by petition to the Interstate Commerce Commission for relief. All freight tariffs issued by any such railroad relating to interstate traffic in this State shall be filed in the office of the commission within thirty days after the passage and publication of this act, and all such tariffs thereafter issued shall be filed with the commission when issued." Section 47.

"If any railroad shall do or cause to be done or permit to be done any matter, act or thing in this act prohibited, or declared to be unlawful, or shall omit to do any act, matter or thing required to be done by it, such railroad shall be liable to the person, firm or corporation injured thereby in treble the amount of damages sustained in consequence of such violation, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case: Provided, that any recovery as in this section provided, shall in no manner affect a recovery by the state of the penalty prescribed for such violation." Section 51.

"Any officer, agent or employé of any railroad who shall fail or willfully refuse to fill out and return any blanks as required by this act, or shall fail or refuse to answer any questions therein propounded, or shall knowingly or willfully give a false answer to any such question, or shall evade the answer to any such question, where the fact inquired of is within his knowledge, or who shall, upon proper demand, fail or willfully refuse to exhibit to the commission or any commissioner, or any person authorized to examine the same, any book, paper or account of such railroad, which is in his possession or under his control, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not less than one hundred dollars nor more than one thousand dollars for each such offense; and a penalty of not less than five hundred dollars nor more than one thousand dollars, shall be recovered from the railroad for each such offense when such officer, agent or employé acted in obedience to the direction, instruction or request of such railroad or any general officer thereof." Section 52.

"If any railroad shall violate any provision of this Act, or shall do any act herein prohibited, or shall fail or refuse to perform any duty enjoined upon it, for which a penalty has not been provided, or shall fail, neglect or refuse to obey any lawful requirement, order made by the commission, or any judgment or decree made by any court upon its application, for every such violation, failure or refusal, such railroad shall forfeit and pay into the state treasury a sum of not less than one hundred dollars, nor more than ten thousand dollars for such offense. In construing and enforcing the provisions of this section, the act, omission or failure of any officer, agent, or other person acting for or employed by any railroad, acting within the scope of his employment, shall in every case be deemed to be the act, omission or failure of such railroad." Section 53.

"The commission shall have power when deemed by it necessary to prevent injury to the business or interests of the people or railroads of this state in consequence of interstate rate wars, or in case of any other emergency to be judged of by the commission, to temporarily alter, amend, or, with the consent of the railroad company concerned, suspend any existing passenger rates, freight rates, schedules and orders of any railroad or part of railroad in this state. Such rates so made by the commission shall apply on one or more of the railroads in this state or any portion thereof as may be directed by the commission, and shall take effect at such time and remain in force for such length of time as may be prescribed by the commission." Section 54.

"The commission shall inquire into any neglect or violation of the laws of this state by any railroad corporation doing business therein, or by the officers, agent, or employés thereof, or by any person operating a railroad, and shall have the power, and it shall be its duty, to enforce the provisions of this act as well as all other laws relating to railroads and report all violations thereof to the Attorney General; upon the request of the commission it shall be the duty of the Attorney General or the prosecuting attorney of the proper county to aid in any investigation, hearing, or trial had under the provisions of this act, and to institute and prosecute all necessary actions or proceedings for the enforcement of this act or the recovery of penalties payable

to the state, and of all other laws of this state relating to railroads, and for the punishment of all violations thereof." Section 57.

"This act shall not have the effect to release or waive any right of action by the state or by any person for any right, penalty or forfeiture which may have arisen or which may hereafter arise under any law of this state; and all penalties and forfeiture accruing under this act shall be cumulative and a suit for, and recovery of one, shall not be a bar to the recovery of any other penalty." Section 60.

A restraining order was issued upon application of the complainant, and subsequently the defendants demurred to the bill.

W. W. Cotton, for complainant.

A. M. Crawford and Teal & Minor, for defendants.

WOLVERTON, District Judge (after stating the facts as above). This case has been submitted both upon the demurrer to the bill and upon application for a preliminary injunction. Logically the demurrer should be first considered. The allegations of the bill to the effect that the railroad commission act of Oregon and the order of the commission, made in pursuance thereof, fixing the rates complained of, are an invasion of the exclusive right of Congress to regulate interstate commerce, that the rates so fixed and established are unreasonable and unjust, and that complainant is practically inhibited from having the question as to whether they are in fact unreasonable and unjust adjudicated by a tribunal of justice by reason of the supposed drastic penalties imposed for an attempt to obtain such an adjudication, beyond dispute present federal questions for decision, and this court has jurisdiction of the controversy. This would be true, whether complainant's position were maintainable or not in fact; for that is not to the purpose. The federal questions remain, and afford basis for interposition by the federal courts. It is unnecessary to cite authorities in support of this position.

Three questions are urged as arising under the federal Constitution, all of which challenge the validity of the order of the Railroad Commission. They are as follows: First, that the order, if effective, regulates interstate commerce; second, that by reason of the exorbitant and drastic penalties imposed by the act for the violation of any order adopted by the Railroad Commission, such act in practical effect deprives the complainant of the equal protection of the laws, and subjects its property to be taken without due process of law; and, third, that the ultimate effect of the order, if operative, will be to prevent the complainant from making fair net earnings, and will thus deprive the complainant of its property without due process of law.

Two other questions, not federal, are also urged, namely: First, whether the rates established by the order of the commission are reasonable; and, second, whether the Oregon Legislative Assembly, by such act, conferred upon the Railroad Commission legislative, executive, and judicial functions, in violation of the provisions of the state Constitution.

If any of these questions be answered in the affirmative, the work of the Railroad Commission must fail of its purpose. They will be examined, beginning with the last, and the others in the order of their statement. We are to determine the validity of the act from its pro-

visions. Does the act combine, in a legal and constitutional sense, legislative, executive, and judicial functions of government, and empower the Railroad Commission to exercise the same?

Under the state Constitution the powers of government are divided into three separate departments, namely, the legislative, the executive (including the administrative), and the judicial; and no person charged with the official duties under one of these departments is competent to exercise any function of the other, except as provided in the Constitution itself. Section 1, art. 3, Const. Or. This is an express declaration of the segregation of the powers of government. The Constitution of the United States as effectively segregates such powers of government, but without an express declaration to that effect. That instrument provides (section 1, art. 1) that "all legislative powers herein granted shall be vested in a Congress of the United States"; (section 1, art. 2) that "executive power shall be vested in a President of the United States"; and (section 1, art. 3) that "the judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish."

Thus it is that, while the powers of government under the national Constitution are actually apportioned to or divided into three departments, there is no express declaration that they shall be so apportioned or divided. The thing is done by establishing, severally, each of the three departments of government, and they are as effectually separate departments as if the Constitution had in so many words so declared, as does the state Constitution. In legal effect, therefore, there is no difference between the division of governmental functions under the one Constitution as compared with the other, save that the administrative powers are included with the executive in the state government.

The principle of the segregation of the three functions of government was not a concept incident to Revolutionary times, leading to the adoption of the American Constitution, but a maxim having its outgrowth from the British Constitution, the meaning of which is, as interpreted by Mr. Madison in one of his notable contributions to The Federalist, that:

"Where the whole power of one department is exercised by the same hands which possess the whole power of another department, the fundamental principles of a free constitution are subverted." The Federalist, p. 375.

The concept is the more readily discernible through the works of Montesquieu. He says:

"There can be no liberty, where the legislative and executive powers are united in the same person, or body of magistrates," or "if the power of judging be not separated from the legislative and executive powers."

Under the British Constitution, while there is a separation of these distinctive departments of government, there remains a blending more or less of the powers. As, for instance, the executive retains the prerogative of making treaties, which, under certain limitations, have the force of legislative acts. The members of the judiciary are appointed by the executive. One branch of the legislative department acts as constitutional adviser to the executive, while, on the other hand, it has

the sole power in cases of impeachment, and is invested with the supreme appellate jurisdiction in all other cases. So, also, the judiciary is so far connected with the legislative department as to participate in its deliberations, although not entitled to a legislative vote.

In the colonial times of the seventeenth century, the Legislatures were chosen by the people, the executives, with two exceptions, were appointed by the Crown, and the judges were named by the executive, and usually with the assent of the council, so that there was a conformation to the idea of a three-fold division of government; but the lines of division were not cast upon fixed principles. Experience under a republican form of government has strengthened the concept of holding separate and distinct the three estates of governmental function, and in some measure marked more distinctly the lines of cleavage. Neither the national Constitution nor the Constitution of any state under the Union has eliminated entirely the blending, to a greater or less extent, of these co-ordinate powers; nor does it seem possible that such a thing can be accomplished in practical operation.

Without allusion to the blending of these co-ordinate powers under the federal Constitution, which is somewhat greater than under the state Constitution, I may make reference shortly to the provisions under the state Constitution which, to an extent at least, are a trenching of one branch of the government upon the powers and functions of the other. The legislative may regulate the practice in the courts of justice, and it does in practice fix the salaries of the executive and the members of the courts of justice, and it may sit in judgment of removal of the judges from office. The executive is invested with the veto power upon acts of the Legislature, it may grant pardons, and may remove from office a judge of the Supreme Court upon the joint resolution of the Legislative Assembly. The judiciary may determine the constitutionality of any law adopted by the Legislative Assembly. These things are permissible, it is true, under the direct provisions of the fundamental law; but the necessity of their adoption demonstrates the impossible condition of fixing absolute lines of cleavage, so that there will be no trenching, in any degree or measure, of the functions of one department upon those of another. Indeed, there must be some latitude in this direction in order to the greatest practical exercise of the co-ordinate powers conferred. In other words, there is no absolute line of cleavage in governmental range, under this concept of a republic, that will leave the one department absolutely free from the domination in some way or measure of the other. Further than this, the very concept itself, · or the maxim, as our forefathers were wont to call it, carried with it the idea that the powers of one department should be adaptable in their exercise to operate as a check and balance upon the appropriate powers of the other. There can never be established in practice, I apprehend, an exact line of division in the exercise of these powers. Mr. Thorpe might well remark, as he does in his work entitled the Constitutional History of the United States (volume 1, p. 14), speaking of the colonial conditions of the seventeenth century, that:

"The so-called three political estates, the legislative, the executive, and the judiciary, seem ever to have been, as they are with us to-day, in a state of flux."

The course of development in the concept of the three estates in government in colonial usage has been to curtail the original powers of the legislative and to increase the powers of the other two departments. For instance, the governor of the colonies could not veto bills, nor grant pardons or reprieves. The Governor can now do so under most, if not all, of the state Constitutions; and the Legislatures are shorn of their authority in most, if not all, instances to sit as courts of appeal in judicial controversies. The state Constitutions, as well as the federal Constitution, are creative of these checks and balances which have been deemed most advantageous to the beneficial operation of good government, and as securing the broadest liberty to the people. The idea of a three-department government is, therefore, common to all the state Constitutions, as well as to the federal Constitution; but provisions vary appreciably as to the delegation of powers that may be exercised by the one department or the other. None of them, however, break on a strict line of legislative, executive, and judicial functions. Nor in the exercise of these powers has it been possible, or found expedient, to observe with exactness absolute lines of cleavage. In support of these observations, Mr. Justice Story, in his work on the Constitution, has this to say:

"But when we speak of the separation of the three great powers of government, and maintain that the separation is indispensable to public liberty, we are to understand this maxim in a limited sense. It is not meant to affirm that they must be kept wholly and entirely separate and distinct, and have no common link of connection or dependence, the one upon the other, in the slightest degree. The true meaning is that the whole power of one of these departments should not be exercised by the same hands which possess the whole power of either of the other departments, and that such exercise of the whole power would subvert the principles of a free constitution."

These observations are sufficient to indicate the scope and meaning of the maxim. Let us now inquire what the judicial construction has been as it pertains to a measure of the sort here under consideration. As the division of the three departments of government is framed upon essentially the same lines under the federal Constitution as under the Constitution of the state of Oregon, we should look first to the adjudications in these jurisdictions.

There has been but one case decided in the state court that has relation to the subject. State v. Southern Pacific Company, 23 Or. 424, 31 Pac. 960. The suit was instituted to enforce the schedule of rates fixed by a Railroad Commission constituted by act of the Legislature. The commission, it seems, was empowered to fix rates for transportation of freight, and if a compliance with its order in this respect was refused then to institute a suit in the name of the state for the purpose of enforcing obedience thereto. The commission prevailed in the suit, and the railroad company was required, at the hands of the court, to conform to the order of the commission fixing the rates; but no question was raised as to the constitutional authority or power of the commission to fix such rates, or as to whether, in fixing such rates, it exercised a legislative, judicial, or administrative function— it being apparently conceded that its powers were adequate in respect of making rates, in so far as they were reasonable.

Advancing, now, to the federal adjudications, it may be observed that the railroad commission act of the state contains many features and regulations quite in common with the interstate commerce act of Congress (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]) and its amendments (1 Supp. Rev. St. pp. 529, 684, 891); the signal difference between the two acts being that in the former the commission is empowered to fix the rates, which, when fixed, are made prima facie reasonable and just, and, if controverted by an interested party, the burden is cast upon such party to institute the proper proceedings or suit, and to overcome the prima facie case by proof to the contrary, while in the latter the commission orders and directs changes to be made in rates, if found to be unreasonable and unjust, and the rates named by the commission are deemed to be prima facie reasonable and just, and if the interested party refuses to obey the orders of the commission naming the rates the commission is authorized to enforce obedience by a suit in the federal court. In such a suit the party contesting has the burden of overcoming the prima facie case of the reasonableness of the rates directed by the commission for adoption, and must do so in its defense, or the commission's order will stand.

The difference in the procedure consists chiefly in this: That in the one case the carrier must sue to overcome a prima facie case, while in the other the commission must sue to enforce its order, and the carrier must overcome the prima facie case by its defense. This further difference may be noted in the policy of the two acts: The former enforces its behests and the findings and orders of the commission by the imposition of fines and penalties, while the latter must resort, more generally, to the Circuit Court, by remedial action or suit, for an enforcement of the law's mandate and its own recommendations and orders. As to the constitutionality of the interstate commerce act, there seems to be no question. At least, so far as I am aware, there has been no case declaring it unconstitutional or invalid in any particular, while many cases have been determined under its provisions; so that the act stands as a perfectly valid and legitimate regulation for the control and conduct of interstate transportation lines and facilities.

Keeping in mind, therefore, the chief distinctions specified between the two acts, we shall be enabled to determine more readily whether the state statute is unconstitutional or invalid in the particulars complained of. Remarking upon the general subject of legislation in relation to the regulation of interstate commerce, in the case of Interstate Commerce Commission v. Brimson, 154 U. S. 447, 474, 14 Sup. Ct. 1125, 1132, 38 L. Ed. 1047, Mr. Justice Harlan has this to say:

"All must recognize the fact that the full information necessary as a basis of intelligent legislation by Congress from time to time upon the subject of interstate commerce cannot be obtained, nor can the rules established for the regulation of such commerce be efficiently enforced, otherwise than through the instrumentality of an administrative body, representing the whole country, always watchful of the general interests, and charged with the duty, not only of obtaining the required information, but of compelling by all lawful methods obedience to such rules."

In Mississippi a railroad commission act was adopted intrusting a commission with supervision over tariff charges, with authority to con-

tinue such charges from time to time, and to increase or reduce any of said rates according as experience and business operation might justify, and to fix tariffs of charges for those railroads failing to furnish schedules as required. This act was sustained by the Supreme Court of the state, wherein was made the contention that the statute was repugnant to the Constitution of the state, because it created a commission and charged it with the duty of supervising railroads. The Supreme Court of the United States concurred in the view, in a cause involving the same controversy, being one among those known as the "Railroad Commission Cases." See Stone et al. v. Farmers' Loan & Trust Co., 116 U. S. 307, 6 Sup. Ct. 334, 388, 1191, 29 L. Ed. 636. The Constitution of the state of Mississippi is in purport the same as the Oregon Constitution as it respects the division of departments of government, and it contains no special authorization for the establishment of a railroad commission with special powers. The federal case would seem, therefore, to be strongly authoritative of the validity of the Oregon act, although there is but little discussion of the principle involved.

In 1888 the question came up in Iowa, under an act of the Legislature of that state providing a railroad commission and defining its duties. The commission was empowered to make schedules of reasonable and maximum rates, and a penalty was annexed for disobedience on the part of railroad companies in the charging and collecting of tolls and compensation which were unreasonable and unjust. The validity of this act was called in question by a suit instituted in the federal Circuit Court (Chicago & N. W. Ry. Co. v. Dey, 35 Fed. 866, 1 L. R. A. 744), Mr. Justice Brewer presiding. The proposition was advanced that the law was unconstitutional, because it seemed to delegate legislative power. After stating the settled rule of law, as determined by what are known as the "Granger Cases," and others following them (Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77; Chicago, etc., R. R. Co. v. Iowa, 94 U. S. 155, 24 L. Ed. 94; Peik v. Chicago, etc., Railway Co., 94 U. S. 164, 24 L. Ed. 97), that the power of fixing rates is purely legislative, the court says:

"There is no inherent vice in such a delegation of power; nothing in the nature of things which would prevent the state, by constitutional enactment at least, from intrusting these powers to such a board; and nothing in such constitutional action which would invade any rights guaranteed by the federal Constitution. So that, after all, the question is one more of form than of substance. The vital question with both shipper and carrier is that the rates shall be just and reasonable, and not by what body they shall be put in force."

As a third reason he continues:

"While, in a general sense, following the language of the Supreme Court, it must be conceded that the power to fix rates is legislative, yet the line of demarkation between legislative and administrative functions is not always easily discerned. The one runs into the other. The law books are full of statutes unquestionably valid, in which the Legislature has been content to simply establish rules and principles, leaving execution and details to other officers."

And he concludes as follows:

"While, of course, the argument from inconvenience cannot be pushed too far, yet it is certainly a matter of inquiry whether, in the increasing com-

plexity of our civilization, our social and business relations, the power of the Legislature to give increased extent to administrative functions must not be recognized."

After an examination of the few authorities then extant bearing upon the subject, among which he cites Stone v. Trust Co., supra, he sums up that:

"All the authorities that have been cited, or that I have been able to find, bearing upon this precise question, are in favor of the constitutionality of such a delegation of power."

The Iowa Constitution provides for a distribution of powers in almost the identical terms of the Oregon Constitution, save that the executive is not made to include the administrative functions, and no special provision is made otherwise for the establishment of a railroad commission.

Subsequently a case arising in Texas, which challenged the constitutionality of a railroad commission created by the Legislature of that state, was determined in the Supreme Court of the United States. Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014. The distinguished jurist who wrote the opinion in the last case above cited wrote the opinion in this. The constitutional provision in Texas as to the distribution of powers is as follows:

"The powers of the government of the state of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are legislative to one, those which are executive to another, and those which are judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted."

No special provision is otherwise made in the Constitution for creating a railroad commission. The commission, under the act called in question, was empowered to classify and fix rates of compensation for carriage of freight, upon giving appropriate notice to the railroad company affected; it being further provided that, when a railroad company or party in interest was dissatisfied with the decision of any rate, classification, rule, etc., such company or party might file a petition in a court of competent jurisdiction, in Travis county, Tex., against said commission as defendant, and that the reasonableness of the rate, or charge, or classification might there be determined. Note the similarity of these provisions to those of the Oregon act. Stringent penalties are provided for failure on the part of the railroad company affected to comply with the order and directions of the commission. The act was first called in question because of the drastic penalties imposed for any violation of its provisions. As to this it was decided that the clauses providing punishment might be stricken out, and the act stand as valid law for the regulation of the rates of traffic. As to the question here under discussion, Mr. Justice Brewer says:

"Passing from the question of jurisdiction to the act itself, there can be no doubt of the general power of a state to regulate the fares and freights which may be charged and received by railroad or other carriers, and that this regulation can be carried on by means of a commission. Such a commission

is merely an administrative board created by the state for carrying into effect the will of the state as expressed by its legislation. Railroad Commission Cases, 116 U. S. 307, 6 Sup. Ct. 334, 388, 1191, 29 L. Ed. 636. No valid objection, therefore, can be made on account of the general features of this act—those by which the state has created the Railroad Commission and intrusted it with the duty of prescribing rates of fares and freights, as well as other regulations for the management of the railroads of the state."

Thus is approved the general policy of the act, as well as every provision thereof save the clauses pertaining to penalties for violation. It is worthy of note that the law had now advanced to such a state of development and certainty that the learned justice was no longer in doubt as to the propriety and constitutionality of such an act. His language is now positive and unequivocal. This is now without question the settled doctrine of the federal courts.

A late case upon the subject is Atlantic Coast Line v. North Carolina Corporation Commission, 206 U. S. 1, 27 Sup. Ct. 585, 51 L. Ed. 933. At page 19 of 206 U. S., and page 591 of 27 Sup. Ct. (51 L. Ed. 933), the court, speaking through Mr. Justice White, has this to say:

"The elementary proposition that railroads, from the public nature of the business by them carried on and the interest which the public have in their operation, are subject, as to their state business, to state regulation, which may be exerted either directly by the legislative authority or by administrative bodies endowed with power to that end, is not and could not be successfully questioned, in view of the long line of authorities sustaining that doctrine."

Mr. Noyes, in his work on American Railroad Rates, lays down the following as the law in the premises:

"The Legislature cannot delegate its power to make laws. Statutes can be enacted only by the agency created by the Constitution for the purpose. But when the Legislature has adopted general rules, it may delegate the power to apply them to specific facts, and to exercise discretion in respect thereto. A commission may be created to perform legislative functions of a quasi administrative character. When the Legislature has declared that railroad rates shall be reasonable and just, it may authorize a commission to fix the specific charges. Any other conclusion would practically prevent the Legislature from exercising its power to make rates. The country is so large, the railroads so numerous, and conditions so variable and changeable, that direct rate making by the Legislature, with annual or biennial sessions, would be wholly out of the question. Moreover, Legislatures are not adapted to pass upon the matters of detail necessary in making rates. * * * When a commission, in the exercise of power delegated by the Legislature, makes a rate, the result is the same as if the Legislature directly acted. The act of the commission supplements and makes effective the act of the Legislature. The rate resulting from the joint action of the Legislature and its agent is the law. Making a rate in legal effect is making a law that such shall be the rate."

So it is said in a very recent case that has just come to my notice:

"It is true that the function of fixing rates is legislative in its nature, yet it seems well settled now that the creation of a commission, with power to fix rates, is not an unconstitutional delegation of legislative power." Railroad Commission v. Central of Georgia Ry. Co. (C. C. A.) 170 Fed. 225, 238.

These authorities render it unnecessary to examine specifically the various state adjudications bearing upon the subject, especially as the three federal cases, namely, Stone v. Trust Co., Chicago & N. W. Ry. Co. v. Dey, and Reagan v. Farmers' Loan & Trust Co., arose under

state Constitutions very similar in the arrangement of the departments of government to the Oregon Constitution, and thus, being federal cases, they have peculiar force and applicability here. I may cite, however, the case of State v. Missouri Pac. Ry. Co., 76 Kan. 467, 92 Pac. 606, which is very instructive, and is in full accord with the federal adjudications.

Just when an act is the exercise of a legislative, when of a judicial, and when of an executive, function is often difficult to determine. Mr. Justice Marshall says:

"The difference between the departments undoubtedly is that the Legislature makes, the executive executes, and the judiciary construes the law." Wayman v. Southard, 10 Wheat. 1, 46, 6 L. Ed. 253.

By this general definition we have not gotten very far in the way of submitting a rule for determining nice distinctions as to what of these functions are being exercised in all cases. "And it is said," observes Mr. Cooley, in his work on Constitutional Limitations (7th Ed.) p. 132, "that that which distinguishes a judicial from a legislative act is that the one is a determination of what the existing law is in relation to some existing thing already done or happened, while the other is a predetermination of what the law shall be for the regulation of all future cases falling under its provisions."

Mr. Justice Holmes adopts this distinction with equal clearness in Prentis v. Atlantic Coast Line, 211 U. S. 210, 226, 29 Sup. Ct. 67, 71, 54 L. Ed. ——, and makes the deduction therefrom that:

"The establishment of a rate is the making of a rule for the future, and therefore is an act legislative, not judicial, in kind."

In Chicago & Grand Trunk Railway Company v. Wellman, 143 U. S. 339, 344, 12 Sup. Ct. 400, 402, 36 L. Ed. 176, the court says:

"The Legislature has power to fix rates, and the extent of judicial interference is protection against unreasonable rates."

And in Chicago, Milwaukee & St. Paul Railway Company v. Minnesota, 134 U. S. 418, 458, 10 Sup. Ct. 462, 467, 33 L. Ed. 970, that:

"The question of the reasonableness of a rate of charge for transportation by a railroad company, involving as it does the element of reasonableness both as regards the company and as regards the public, is eminently a question for judicial investigation, requiring due process of law for its determination."

And so it was said in Interstate Commerce Commission v. Railway Co., 167 U. S. 479, 499, 17 Sup. Ct. 896, 900, 42 L. Ed. 243, putting the two principles into juxtaposition:

"It is one thing to inquire whether the rates which have been charged and collected are reasonable—that is a judicial act; but an entirely different thing to prescribe rates which shall be charged in the future—that is a legislative act."

With these two principles established, we may now determine whether the railroad commission act transcends the constitutional mandate of the state of Oregon in segregating the three departments of government. The commission is empowered, upon complaint, or upon its own initiative, and upon notice to the railroad company, to proceed to

an investigation as to whether the rates charged are unreasonable or unjust, and, if found to be so, to thereupon fix and order substituted for the original rates such rates as the commission shall determine to be reasonable and just. The order becomes effective 20 days after the service thereof upon the company. The act makes the rates and charges thus fixed prima facie lawful and reasonable only until finally found otherwise in an action instituted as subsequently provided.

Now, it is urged that the act of the commission, determining what rates are reasonable and fixing them for the future regulation of the railroad company, is a judicial act. Not so within the intendment of the law. It is first prescribed that all rates shall be reasonable. The railroad is subject to this injunction, as well as the commission. When it transpires that the railroad company is not observing the law, then the commission is charged with the duty of fixing a rate for the company. This, the authorities say, is a legislative function; but it may be done through the instrumentality of a railroad commission. The order of the commission being prima facie lawful, and the rates fixed prima facie reasonable, it is provided that it shall become operative in due course, unless the company is dissatisfied with the rates fixed by the commission. If so dissatisfied, the company is given a remedy for having judicially determined the reasonableness of such rates. There is language defining the duty of the commission in this relation, and delineating its procedure, that impresses one at first blush that it was designed that the commission should act judicially in determining this. But the fact that it is not made the final arbiter, that its order is only prima facie lawful, and the rates thereby fixed only prima facie reasonable, and that a court of constitutional judicatory is made the final forum in which to determine the reasonableness of such rates, demonstrates the true intendment of the commission act.

The Legislature can fix rates upon traffic, but in their establishment they must be reasonable. If unreasonable, the courts will declare them so. In fixing such rates, an investigation must necessarily precede the legislative action; but the law declares that the Legislature may fix rates through a functionary called a commission, and, when the commission acts, it is as if the Legislature had fixed the rates. But, like the rates established by the Legislature, if unreasonable, such rates are not binding upon the transportation companies affected. Recognizing this condition, the act in question has provided a remedy whereby the rates fixed may be judicially determined as it respects their reasonableness. The act of the commission being valid prima facie, the rates fixed become a law unto the carrier until a competent court declares them to be unreasonable. Just so with an act of the Legislature fixing rates, because no law fixing unreasonable rates can bind the carrier. I see no legal or constitutional objection to the legislation proceeding in this way to a regulation of rates and tariffs upon transportation lines within the state.

That the burden is cast upon the carrier of first resorting to a court of justice for a determination of the reasonableness of the rate, if he desires to contest the action of the commission, rather than upon the commission to sue if resistance to the rate ordered to be observed is made, as provided in the interstate commerce act, is not a distinction

that differentiates the two acts in principle. In either case the carrier is given his day in a court of justice upon the question of the reasonableness of the rate prescribed, with the identical presumptions of law attending the controversy. So that if the interstate commerce act of Congress is valid and constitutional in this respect, the state act ought to be also. And, furthermore, that the circuit court of Marion county is named in the act as the forum to which the aggrieved carrier must resort for relief does not detract from the validity of the law, as the fact remains that a judicial tribunal is afforded in which to have the question of reasonableness determined. The Texas act contained just such a provision, which act was approved in Reagan v. Farmers' Loan & Trust Co., supra. In reality, the resort to the circuit court of Marion county is part of the procedure by which the final test of the reasonableness of the rates might be determined, if challenged by the carrier. It might be that the complainant would have no remedy in a court of equity here until it had exhausted its remedy in that particular court for determining the reasonableness of the rates contended for. See Prentis v. Atlantic Coast Line, supra. Mr. Justice Holmes there says:

"No rate is irrevocably fixed by the state until the matter has been laid before the body having the last word."

But see Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819.

I do not presume to decide this question, however, as applied to the present controversy. It should be remarked that the court provided for acts judicially in determining the matter finally, not in a legislative capacity, so that there is not a combination of legislative and judicial functions in one person or body. The intendment of the act is that the Railroad Commission shall exercise the administrative power necessary to make the legislative act of fixing rates effective, and attend to the administration of the law, while the judiciary shall exercise the judicial power by passing upon the reasonableness of the rates fixed by the commission, when questioned.

Reliance is placed upon the case of Chicago, etc., Ry. Co. v. Minnesota, supra, as opposed to this view. Such, however, is not the doctrine of that case. The case came up by writ of error to the Supreme Court of Minnesota. The commission act of the state regulating the fixing of rates and charges was considered valid by that court, and it was declared that:

"The expressed intention of the Legislature is that the rates recommended and published by the commission (assuming that they have proceeded in the manner pointed out by the act) should be not simply advisory, nor merely prima facie equal and reasonable, but final and conclusive as to what are lawful or equal and reasonable charges; that, in proceedings to compel compliance with the rates thus published, the law neither contemplates nor allows any issue to be made or inquiry had as to their equality and reasonableness in fact. Under the provisions of the act, the rates thus published are the only ones that are lawful, and therefore, in contemplation of law, the only ones that are equal and reasonable; and hence, in proceedings like the present, there is, as said before, no fact to traverse, except the violation of the law in refusing compliance with the recommendations of the commission."

Under this interpretation of the act, the Supreme Court of the United States declared the act to be in derogation of the right to a judicial investigation by due process of law. The question of the delegation of power was not discussed or determined. Nor was the supposed encroachment of one department of government upon another brought into dispute or controversy. The simple fundamental question was decided that such an act in its operation, as interpreted by the Supreme Court of Minnesota, deprived the transportation company of its right and property without due process of law.

Along with the contention that the Railroad Commission is empowered to exercise judicial functions is another: That it is also empowered under the act to exercise executive functions. It will be noted that the executive department of government includes also the administrative. This widens very largely the scope of the functions of that department. By a reading of the railroad commission act, it will be seen that the commission is charged with supervising and doing many things which are merely administrative. Some are possibly executive upon a strict division of powers. But this alone ought not to condemn the law. As I have previously observed, it is impossible to find, an exact boundary line dividing these constitutional powers; that is to say, in providing for the innumerable exigencies arising for governmental supervision and control, it is not always possible to place the authority in every detail with the appropriate department of government. So that, as to the minor matters, it ought not to be considered inimical to the Constitution if given into the charge of one department when they appropriately belong to another. The essential thing is that there shall not be a usurpation of the functions of one department by another department, so as practically to destroy or seriously to endanger the polity of a tripartite division of powers. Of course, there are many things that belong absolutely to the one department or the other. Where these are plain and important, they should be assigned to the appropriate department for administration, and, if not so assigned, the law should not stand, because of the hurtful encroachment upon the proper domain of a department. But, where the assignment of power is scarcely distinguishable, or where it works no practical encroachment upon the functions of another department, it is difficult to see why such law should not stand.

Now, the commission is charged with many duties that are not executive, but purely administrative or ministerial. It must inquire into the management of the business of railroads, and shall keep itself informed as to the manner and method in which the same is conducted. Section 39 of the act. It shall require annual reports. Section 40. It may require a uniform system of accounting. Section 43. It may require a list of passes to be furnished. Section 45. And it shall make report to the Governor annually, and recommend such legislation as may be deemed important. Section 46. All these things would seem to be merely administrative. Others would seem to be more nearly executive, as, for instance, the commission is empowered to make complaint before the Interstate Commerce Commission, with a view to rectifying excessive or discriminatory rates and charges. Section 47.

173 F.—62

And it shall inquire into any neglect or violation of the laws of the state by any railroad corporation doing business therein. It is also made its duty to enforce the provisions of the act here in question, as well as all other laws relating to railroads. Section 57.

But this commission is no exception to the creation of administrative officers and boards of commission, charged with like and kindred duties. The Legislature has created a Board of Canal Commissioners, a Board of Fish Commissioners, a Board of Agriculture, an Insurance Commissioner, the Secretary of State being made, ex officio, such commissioner, a Food and Dairy Commissioner, and a Commissioner of the Bureau of Labor Statistics and Inspection of Factories and Workshops. It is especially made the duty of this latter officer to cause to be enforced all the laws regulating the employment of children, minors, and women—a function executive in character, for the executive department is charged with the duty to see that the laws are faithfully executed. But all these boards and officers, in the general scope of their powers, are charged with administrative, rather than executive, duties. Such is the character of the railroad commission act, so that the situation comes to this: The Legislature has delegated to the commission the duty of fixing rates, which it does in aid of legislative action, or as an auxiliary to the exercise of the legislative functions. This the authorities all sanction as falling within the legislative power. There can exist no valid objection to conferring such authority upon an administrative board. The board thereafter administers the law as devised. Certainly such a regulation does not clothe an officer or officers in one department with official duties appertaining to those of another. Nor does it commingle the appropriate functions of the several departments of government.

I conclude, therefore, that the first objection urged against the constitutionality of the act is not maintainable.

The next objection urged to the act is that it is an encroachment upon the constitutional authority of Congress, in that, in practical operation, it interferes with interstate commerce. It is one thing to determine whether the act itself attempts to regulate interstate commerce, and another to determine whether in its practical operation it is effective to that end. I assume that, if an affirmative answer is given to either of these questions, the law cannot stand. Congress is accorded, under the federal Constitution, power "to regulate commerce with foreign nations and among the several states and with the Indian tribes." Section 8, art. 1. By the ninth article of amendment to the Constitution it is declared that:

"The enumeration in the Constitution of certain rights shall not be construed to deny or disparage others retained by the people."

And by the tenth article:

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."

Thus is indicated, as strongly as could be, that the Constitution of the United States is but a delegation of powers, which powers, together with the implied powers that attend those that are express,

necessary to a practical and efficient exercise thereof, constitute all that the general government has, or can presume to exercise. All other powers are reserved to the states, and to the people thereof— primarily to the people, as they are the repository of all power, political and civil. The whole lawmaking power out of this repository of power is committed to the several state Legislatures, except such as has been delegated to the federal government or is withheld by express or implied reservation in the state Constitutions. Says Denio, Chief Justice, in People v. Draper, 15 N. Y. 532, 543:

"Plenary power in the Legislature, for all purposes of civil government, is the rule. A prohibition to exercise a particular power is an exception. In inquiring, therefore, whether a given statute is constitutional, it is for those who questioned its validity to show that it is forbidden. I do not mean that the power must be expressly inhibited; for there are but few positive restraints upon the legislative power contained in the instrument. The first article lays down the ancient limitations which have always been considered essential in a constitutional government, whether monarchical or popular; and there are scattered through the instrument a few other provisions in restraint of legislative authority. But the affirmative prescriptions and the general arrangements of the Constitution are far more fruitful of restraints upon the Legislature. Every positive direction contains an implication against anything contrary to it, or which would frustrate or disappoint the purpose of that provision. The frame of the government, the grant of legislative power itself, the organization of the executive authority, the erection of the principal courts of justice, create implied limitations upon the lawmaking authority as strong as though a negative was expressed in each instance; but independently of these restraints, express or implied, every subject within the scope of civil government is liable to be dealt with by the Legislature."

So says Redfield, Chief Justice, in Thorpe v. Rutland & Burlington Railroad Co., 27 Vt. 140, 142, 62 Am. Dec. 625:

"It has never been questioned, so far as I know, that the American Legislatures have the same unlimited power in regard to legislation which resides in the British Parliament, except where they are restrained by written Constitutions. That must be conceded, I think, to be a fundamental principle in the political organizations of the American states. We cannot well comprehend how, upon principle, it should be otherwise. The people must, of course, possess all legislative power originally. They have committed this in the most general and unlimited manner to the several state legislatures, saying only such restrictions as are imposed by the Constitution of the United States, or of the particular state in question."

So it is that the national Constitution is wholly a delegation of power, and the state Constitution a restriction or limitation of power; and the state Legislatures may exercise all the reserved powers, save those which the people have withheld. It follows, very naturally and logically, from these premises, that the national government is without power and authority to legislate or to supervise or control in any manner the movement of commerce which is entirely within a state, or that which is appropriately termed intrastate, as distinguished from interstate, commerce. This arises simply from the want of power, the lack of delegation of power, to legislate touching that class of commerce. Upon the other hand, the sole power for the regulation of intrastate commerce rests with the state Legislatures. Congress has expressly recognized this distinction of powers in the passage of the act to regulate commerce of February 4, 1887. 1 Supp. Rev. St. p. 529. The act declares that the provisions thereof "shall not apply to the trans-

portation of passengers or property, or to the receiving, delivering, storage, or handling of property, wholly within one state." So it has been pertinently observed by Mr. Justice Harlan, in Interstate Commerce Commission v. Brimson, supra, to the same effect.

The express purpose of the railroad commission act is to regulate transportation and commerce, and common carriers thereof, within the state. This is apparent, both from the title of the act and from the provisions thereof. The title runs:

"To regulate transportation and commerce, and common carriers thereof in this state, and, for that purpose, to create a Railroad Commission of Oregon," etc.

By the eleventh section the term "railroad" is defined to embrace all corporations that now, or may hereafter, operate, manage, or control "any railroad or interurban railroad  *  *  *  as a common carrier in this state." And it is further declared that:

"The provisions of this act shall apply to the transportation of passengers and property  *  *  *  and to all charges connected therewith, and shall apply to all railroad companies," etc., "that shall do business as common carriers upon or over any line of railroad within this state."

By section 13 it is required that every railroad shall file with the commission schedules showing all rates, fares, and charges for the transportation of passengers and property, "which it has established and which are in force at the time between all points in this state upon its line"; by section 18, that "whenever passengers or property are transported over two or more connecting lines of railroad between points in this state," the joint rates of charge therefor shall be reasonable and just. These general provisions indicate an undoubted purpose to limit the scope of the exercise of the commission's powers within the state. But by section 47 it is made the duty of the commission to investigate freight rates on interstate traffic on railroads in the state, and when, in the opinion of such commission, the rates are excessive or discriminatory, to present the facts thereof to the offending railroad company, and, if without avail, then to apply to the Interstate Commerce Commission for relief. From this one provision of the act, if from none other, the deduction is absolute that there was no intention on the part of the Legislature of the state to enter the domain of interstate regulation of railroad traffic. The commission is a state commission, designed to render state service, and no intendment should be deduced that it is empowered to execute a broader or an unlawful service, unless the language is explicit, unmistakably leading to such conclusion. No such language is found in the act, and upon its face it is not inimical to the commerce clause of the national Constitution.

The order of the commission enjoining upon the complainant the adoption of the classification therein prescribed is not so specific, but the purpose is reasonably deducible. The mandate of the order is that complainant "shall cease and desist from charging any higher rates within this state for the transportation of merchandise and other commodities between the city of Portland and points on the defendant's main, branch, leased, or otherwise controlled railroad lines with-

in the state of Oregon, covered by the class rates in said tariff No. L—525, O. R. C. No. 39, I. C. C. No. 1,146, than the class rates prescribed in this order." Then follows the basis of the rates prescribed, or rather the formula by which they may be readily ascertained. The order, therefore, can be effective only within the state of Oregon. In this there is no ambiguity. That the Western Classification was taken upon which to base the formula for ascertaining the rates ordered to be substituted cannot change the purpose of the order. The result would have been the same if the commission had fixed the same rates without using tariff L—525 as a basis for its formula. The order is not specific, however, in this: That it does not, in direct terms, say that the rates so fixed shall apply to the transportation of intrastate commerce only; but, considering that the commission is a state organism, imbued with authority to fix rates within the state and not beyond its confines, it is but a legitimate deduction that its purpose in promulgating the order was to prescribe rates effective as relating to intrastate, and not interstate, commerce. Presumptions are always in favor of the lawful exercise of a power—not that it was unlawfully exercised, or that a functionary has exceeded the authority delegated or bestowed. So that, as matter of law, neither in the intendment of the act, nor in the draft of the order, has there been an invasion of the right and power of Congress to regulate commerce between the states. I regret that the state court has not first construed this statute, as its judgment would constitute a rule of action for the federal courts; but, in the absence of such construction, the duty is devolved upon this court.

The next inquiry is: Has there been such an invasion by the practical operation of the act, under the order of the commission, if effective? At the time the order complained of was made by the State Railroad Commission, Union Pacific tariff No. 1,578, with supplements, was in force and effect, having been duly filed with the Interstate Commerce Commission. Briefly, this tariff covers transportation between Missouri river and common points to various stations on the Oregon Railroad & Navigation lines in Oregon east of The Dalles, other than the station of Pendleton. So, also, was in force and effect transcontinental terminal tariff No. 4—C, covering transportation between Mississippi and Missouri river common points and certain North Coast terminals, including Portland, Or. Tariff L—525, with supplements thereto, which is known as the "Western Classification," was likewise in force and effect, and fixes the class and commodity rates between Portland and all points in Oregon, Washington, and Idaho on the line of the complainant's railroad. Another tariff, designated "O. R. & N. I. C. C. No. 967," which is joint between the San Francisco & Portland Steamship Company and the complainant, covers transportation between San Francisco and points and places on complainant's lines in Oregon east of The Dalles. And still another joint tariff was in force between the Southern Pacific lines and the complainant's, covering transportation between points in California and Portland, Oregon, and all points in Oregon east of The Dalles. This is designated "S. P. I. C. C. No. 2,130." It is further made to appear by the bill that the through rates from California, both by way of the San Fran-

cisco & Portland Steamship Company's line and that of the Southern Pacific to points east of The Dalles, consist mainly of a combination of the rates fixed by tariff No. L—525 from Portland to such points east of The Dalles and certain arbitraries or local rates. The arbitraries are not given, nor the basis upon which they are estimated or ascertained. Where, also, the rates by tariff U. P. No. 1,578 are higher for transportation from points of shipment from Missouri river common points to points in Oregon east of The Dalles on complainant's lines than the combined rates from such Missouri river common points to Portland, under said tariff No. 1,578, and the rates from Portland out under tariff No. L—525, the regulations require that the shipments shall take the combined rates.

As to class rates, the combination is generally somewhat lower than the through rate from Missouri River common points to points in Oregon east of The Dalles; but as to commodity rates the combination is somewhat higher. If, however, the rates sought to be established by the State Railroad Commission be put in force, the combination rates on commodities will be less than the through rates from Missouri river common points to points on complainant's lines east of The Dalles. This is designed to indicate how the established rates for interstate transportation will be disturbed and affected by an adoption of the proposed state rates. In further demonstration of the situation, it is alleged that at least 70 per cent. of the freight carried from Portland to points east of The Dalles, under the class rates established under Western Classification No. L—525, originates at points along or east of the Missouri river or in California, and is transported from said Eastern points and California to Portland, and thence to points east of The Dalles, while large quantities of freight are transported directly from Eastern and California points to points east of The Dalles, in Oregon, under the through rate.

It seems to be premised by counsel for complainant that the commission's order does not relate to purely internal commerce originating within the state of Oregon, or such commerce as may be appropriately designated "intrastate commerce." If this premise be admitted, it must be at once conceded that the state commission has attempted to act beyond the scope of its authority. Counsel's premise is at fault, however. As has been previously shown, the commission presumptively has acted within the scope of its authority, which was to prescribe rates applicable to the transportation of intrastate commerce only. But, beyond this, it seems to be thought that, if a state tariff affects an interstate tariff in the slightest measure, though incidentally, it must give way to the latter, and hence is void and inoperative. For instance, it is alleged that, if the state commission's rate becomes effective, many persons will ship their commerce from without the state to Portland, and then reship to points east of The Dalles, or, in another way, wool will be shipped to Portland from points east of The Dalles, and thence east by the transcontinental rates, and thus the complainant will be compelled to re-establish its rates in order to retain its through haul from eastern Oregon points. In other words, interstate traffic will thereby be interfered with, disturbed, and disarranged.

It is, and always will be, a difficult question to determine as to

when and what commerce should be classified as interstate, and when and what should be classified as intrastate. The question depends largely upon the facts and circumstances attending each case as it arises. There can be no doubt that commerce originating within the state and carried to some other point within the state is intrastate commerce. So it is of commerce originating within the state and transported, by continuous carriage, from within to some point without the state, or originating without the state and carried within. That is to be classified as interstate commerce. But when intrastate becomes interstate commerce, and vice versa, is an inquiry involving nice distinctions, perhaps. But we are not concerned with that at the present time. We are dealing with the distinct question of the supposed conflict between the regulation of interstate and intrastate commerce. Let us take a commodity, for instance, manufactured in Portland. Let it be agricultural implements. The state has a perfect and undoubted right to regulate the tariff for transportation of such commodity by rail to any part of the state from Portland, so that the tariff be reasonable; and I may say to any point on complainant's lines, within the state, east of The Dalles. If that regulation interferes with present tariffs for interstate transportation of the same commodity from common points east of the Mississippi or Missouri river to points on complainant's lines east of The Dalles, who can say nay?

But to go a step farther: The same commodity may be shipped to Portland from without the state, and put in common stock. When the commodity thus comes to rest in the state, and is sold by the dealer for transportation from Portland to some other point within the state, it is as much intrastate commerce as the case just put, and the state may, with equal authority, regulate the freight tariff. This is a condition of which complaint is made, lest it be that dealers will take advantage of the local rate, and, selling to customers within the state, ship first to Portland at the transcontinental rate, and thence out to the interior at the local rate. A shipment from the East, via Portland, to a point within the interior of the state, would be interstate commerce; but whether such a shipment could be made to take the classification of interstate commerce by shipment to Portland in the name of the dealer, and then of intrastate classification by the dealer billing it out of Portland again to his patron in the interior, is another question, which we need not decide. It remains clear that, whenever the commodity partakes of the characteristic of intrastate commerce, the state has the right to fix the rates of tariff for its transportation wholly within the state. Take the case of wool again, purchased in eastern Oregon. If that be shipped to a buyer in Portland, why is it not intrastate commerce? That same wool, after being thus shipped to Portland, if it be that such buyer subsequently sells to a buyer in Boston and ships to him at that place, would become interstate commerce. If bought in eastern Oregon for transportation to Boston by way of Portland, the local state rate could not apply, because that would partake of the character of interstate commerce.

The Baker City situation is relied upon as a demonstration that the local or state rates, if approved, will unsettle interstate regulation, or rather will disturb the situation as it now stands. That city is

engaged in a jobbing business, and is importing merchandise from points east of the Missouri river and in California, which it sells to customers within a certain radius of territory in job lots. Under tariff U. P. I. C. C. No. 1,578 and No. L—525, the Baker City jobbers pay a freight rate from point of origin in the East or in California generally equal to the car load rate to Portland plus the car load rate from Portland to Baker City, and are required to pay the less than car load rate from Baker City to points of distribution. Now, the Portland jobber is required to pay the car load rate from point of origin in the East and in California to Portland and the less than car load rate from Portland to point of distribution. So it is, says the complainant, that the profit of the Baker City jobber and his ability to sell merchandise depend upon the difference between the car load rate out of Portland and the less than car load rate from Portland to the point of distribution. It is further claimed that the rates established by the commission's order in comparison with those fixed by L—525 greatly decrease the difference between the car load rates and the less than car load rates from Portland, "so that interstate traffic originating in the East and in California, and so in the past distributed from Portland and from Baker City, respectively, can only be distributed advantageously and with profit from Portland to all points in eastern Oregon," and, therefore, that the commission's order attempts to regulate the movement of, as well as the rate charged upon, interstate commerce.

This is only an illustration of how rate making may destroy, and build up jobbing centers, considering the facts stated to be true, and the deduction legitimate. But transportation companies do not have, nor can they longer claim, a monopoly upon rate making. Suppose, however, Portland was able to supply from home production all the different kinds of merchandise that the Baker City jobber wanted in his trade. A reasonable freight rate made by the state for the transportation of the merchandise to Baker City and interior points would be perfectly legitimate. If that rate enabled Portland, through its home-produced merchandise, to displace the business of the jobber in Baker City, dealing in like merchandise imported from other states, how could it be said that the state freight tariff was unconstitutional, and therefore unlawful? The state rate does not apply to interstate commerce; nor was it designed so to apply. But if the Portland merchant imports his goods, and then jobs them from Portland, the result will be the same as if he were dealing in home products, because the importations will have become domesticated. If that method of dealing constitutes or induces a change in the movement of interstate commerce, it is the thing that the merchant will or will not do as his profits in business may impel him. The movement of his merchandise when it goes out of Portland to the interior of the state is intrastate. I am not speaking now of goods imported to Portland in original packages, and then shipped out to points in the interior of the state in like packages as shipped to Portland, because I am not now called upon to determine whether such character of movement would constitute interstate traffic. It will be time enough to decide such a

case when it arises. I have reference to such merchandise as may be first imported to Portland, and then, going into a wholesale dealer's common stock, is wholesaled or jobbed out to customers in the interior of the state—such a movement of merchandise from Portland to the interior of the state as would constitute intrastate shipment pure and simple. If this kind of traffic, with the freight rate imposed upon it by the state, is of such proportions and such percentage as to affect trade in interstate merchandise, and therefore render it advantageous to interstate lines to change their rates, so as to control the trade in certain channels, that is not a trenching upon the exclusive authority of Congress to regulate interstate commerce. The interference is but incidental, and flows from a perfectly legitimate regulation of freight rates by the state, and an altogether natural movement of trade; and the condition is absolutely beyond the control of Congress.

That I may be fully understood, I will allude to another incident. Counsel for complainant says:

"If the Northern Pacific Railway should receive at Tacoma freight destined to a point in the state of Oregon east of The Dalles, such merchandise would be moved from Portland to the points east of The Dalles over the lines of the complainant, and the rates charged therefor would be the class rates fixed by tariff No. L—525 filed with the Interstate Commerce Commission as required by the interstate commerce act. By the order sought to be set aside the complainant would be required to charge, not the rates fixed by tariff L—525, but the rates established by the order of the commission."

In this statement counsel is mistaken. The shipment would constitute an interstate shipment, and L—525 would prevail as against the state rate. So, if it be that the local state rates, as fixed and regulated by the State Railroad Commission on these commodities, unsettle in some way previously fixed transcontinental or interstate rates, that circumstance does not render the state rates invalid as an interference with interstate commerce. Let it be supposed that the state was the precursor in making rates for the transportation of purely intrastate commerce, there could, then, at that juncture, be no conflict. Could it be contended that the state rate was invalid, because connecting railroads might desire to establish a transcontinental rate in combination with a local rate, also of their own making, which would conflict with the state rate? If so, the fixing of a state rate would be a precarious and evanescent thing, to be dissipated at the caprice of the transportation companies, and the general government would usurp, in practical effect, the functions of the state government in the regulation of intrastate commerce. Such was not the purpose of the framers of the federal Constitution. Nor was it the purpose of Congress itself in the adoption of the interstate commerce act, wherein was recognized, as has been noted before, the right of the state to regulate commerce wholly within its borders. The bill, therefore, in my opinion, states nothing that renders either the state railroad commission act or the order of the commission in conflict with the commerce clause of the federal Constitution. This conclusion is borne out by the decisions of the Supreme Court.

In Wabash, St. Louis & Pacific Railway Co. v. Illinois, 118 U. S. 557, 7 Sup. Ct. 4, 30 L. Ed. 244, the court says:

"For instance, a contract might be made to carry goods for a certain price from Cairo to Chicago, or from Chicago to Alton. The charges for these might be within the competency of the Illinois Legislature to regulate. The reason for this is that both the charge and the actual transportation in such cases are exclusively confined to the limits of the territory of the state, and is not commerce among the states, or interstate commerce, but is exclusively commerce within the state. So far, therefore, as this class of transportation, as an element of commerce, is affected by the statute under consideration, it is not subject to the constitutional provision concerning commerce among the states. It has often been held in this court, and there can be no doubt about it, that there is a commerce wholly within the state which is not subject to the constitutional provision, and the distinction between commerce among the states and the other class of commerce between the citizens of a single state, and conducted within its limits exclusively, is one which has been fully recognized in this court, although it may not be always easy, where the lines of these classes approach each other, to distinguish between the one and the other."

So in Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819, the court says:

"It cannot be doubted that the making of rates for transportation by railroad companies along public highways, between points wholly within the limits of a state, is a subject primarily within the control of that state."

The case of Gulf, Colorado & Santa Fé Railway Company v. Texas, 204 U. S. 403, 27 Sup. Ct. 360, 51 L. Ed. 540, is highly instructive, and is indicative of how the Supreme Court maintains the prerogative of the state government to regulate commerce within its borders. In this case a quantity of corn had been purchased in Hudson, S. D., for delivery at Goldthwaite, Tex. However, in course of the dealings between the parties concerned, the corn was billed to Texarkana, Tex. It remained in that place some five or six days, and was reconsigned from Texarkana to Goldthwaite, Tex. The court says:

"The single question in the case is whether, as between Texarkana and Goldthwaite, this was an interstate shipment."

And it was determined that it was not. The shipment was, therefore, as between the points named, intrastate, and subject to state regulations. There previously existed a through interstate rate from Hudson, S. D., to Goldthwaite, Tex.; but this did not deter the court from adjudging the carriage, under the circumstances recited, to be of intrastate commerce. See, also, The Daniel Ball, 10 Wall. 557, 565, 19 L. Ed. 999, Sands v. Manistee River Improvement Co., 123 U. S. 288, 295, 8 Sup. Ct. 113, 31 L. Ed. 149; and General Oil Co. v. Crain, 209 U. S. 211, 28 Sup. Ct. 475, 52 L. Ed. 754. This last case is further instructive as to when an interstate shipment ceases to be interstate commerce. These authorities I deem to be decisive of the controversy.

Nor does the case of Louisville & Nashville Railroad Co. v. Eubank, 184 U. S. 27, 22 Sup. Ct. 277, 46 L. Ed. 416, hold to a different view. It is rather illustrative of the same principle. The railroad had established a rate for transportation of tobacco from Nashville, Tenn., to Louisville, Ky., at 12 cents per 100 pounds. The rate was so fixed, presumably, on account of water competition between the same points. It had also established a rate from Franklin, Ky., to Louisville, of

25 cents per 100 pounds. The road from Nashville to Louisville ran through Franklin. Eubank shipped large quantities of tobacco from Franklin to Louisville, and paid the established rate, but subsequently sued the railroad company to recover back the excess between 12 cents and 25 cents per 100 pounds. This is the case that came to the Supreme Court. The theory upon which the suit was instituted was that the alleged overcharge was unlawful because the state of Kentucky, by its Constitution, had declared it so to charge more for a shorter than for a longer haul over the same line, under substantially similar circumstances and conditions. The circuit court of the state, from the judgment of which error was prosecuted to the Supreme Court, held, construing this Constitution, that it applied as well to carriage from without the state to points within. Thus construed, the Supreme Court held that the effect of the clause in question in the Kentucky Constitution was to regulate interstate commerce, and hence the judgment of the Kentucky court was reversed. In deciding the case, the court says:

"The vice of the provision lies in the regulation of the rates between points wholly within the state, by the rates which obtain between points outside of and those which are within the state. * * * But the fact which vitiates the provision is that it compels the carrier to regulate, adjust, or fix his interstate rates with some reference at least to his rates within the state, thus enabling the state by constitutional provision or by legislation to directly affect, and in that way to regulate, to some extent the interstate commerce of the carrier, which power of regulation the Constitution of the United States gives to the federal Congress."

Elsewhere the court says:

"We fully recognize the rule that the effect of a state constitutional provision or of any state legislation upon interstate commerce must be direct, and not merely incidental and unimportant; but it seems to us that where the necessary result of enforcing the provision may be to limit or prohibit the transportation of articles from without the state to a point within it, or from a point within to a point without the state, interstate commerce is thereby affected, and may be thereby to a certain extent directly regulated, and in that event the effect of the provision is direct and important, and not a mere incident."

It should be noted that this same clause in the Kentucky Constitution had been previously held by the Supreme Court of the United States (Louisville & Nashville Railroad Company v. Kentucky, 183 U. S. 503, 22 Sup. Ct. 95, 46 L. Ed. 298), as applied to places all of which are wholly within the state, to violate no provision of the federal Constitution, and it was only because an inferior court of Kentucky had put the construction upon the Kentucky Constitution as above indicated, that the clause was here held to be inimical to the commerce clause of the federal Constitution.

Neither does the case of Hall v. DeCuir, 95 U. S. 485, 24 L. Ed. 547, militate against the principle here applicable. The controversy there was concerning a statute of the state of Louisiana which required common carriers of passengers to extend to all persons, without regard to race or color, equal accommodations, rights, and privileges, and the decision of the court proceeded upon the hypothesis that the

statute necessarily and directly affected interstate traffic. Mr. Chief Justice Waite says:

"But we think it may safely be said that state legislation which seeks to impose a direct burden upon interstate commerce, or to interfere directly with its freedom, does encroach upon the exclusive power of Congress. The statute now under consideration, in our opinion, occupies that position. It does not act upon the business through the local instruments to be employed after coming within the state, but directly upon the business as it comes into the state from without or goes out from within."

The cases of Swift & Co. v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518, and Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488, are concerning unlawful combinations in restraint of trade, which affected, not only trade relations within a single state, but such relations also between the states, and hence lack applicability here.

Let us now proceed to the question whether the penalties imposed by the act are of such a nature as practically to deprive the complainant of the equal protection of the law. A way for ascertaining whether the rates fixed by the Railroad Commission are reasonable, by judicial determination, is afforded the carrier by the provisions of the act. The complainant complains, however, that to avail itself of such provisions it must either obey the order of the Railroad Commission pending legislation, or resort to the court for an injunction suspending or staying the order in the meanwhile; but that, if resort be had to the injunction, the act requires the giving of a bond incurring such heavy liabilities in case of failure to sustain the contention that no company could well afford the experiment. The conditions of the bond required are that the company shall answer for all damages caused by the delay in the enforcement of the order of the commission, for all penalties that would attach against the company, and for all compensation for whatsoever sums for transportation services any person or corporation shall be compelled to pay in excess of the sum such persons or corporation would have been compelled to pay if the order of the commission had not been suspended.

Here are three conditions. The last of the three we must dismiss at once, as being perfectly reasonable and just; for if the order of the commission was reasonable, and so adjudged to be by the court, it should be obeyed from the first. As to the first condition, touching what damages would ensue by reason of delay in enforcing the order, none have been suggested that would be at all burdensome, nor do I now think of any of that character.

The second condition, at first blush, would seem onerous, and a drastic thing to require of a litigant. But what are the penalties that would attach against the railroad so circumstanced? By the fifty-first section of the act, if any railroad company shall omit to do any act, matter, or thing required to be done by it, such railroad is rendered liable to the person, firm, or corporation injured thereby in treble the amount of damages sustained in consequence of such violation, together with reasonable attorney's fees. These damages may partake of the nature of a penalty. But what damages would ensue to any person, corporation, or the state for a refusal to obey an order fixing rates? It

might be said that a shipper was damaged by the difference between the rates established by the commission and those charged by the company; but that item is expressly provided for by the third condition, which, by implication, excludes it from the operation of the second. There may be in some way damage to somebody attending the failure of the railroad company to obey the order of the commission and to adopt certain rates; but, whatever it may be, it cannot be large or oppressive, even if trebled.

Now, what other penalties are provided? By section 52 it is declared that, if any officer, agent, or employé shall fail or refuse to do any of the following things, he shall be deemed guilty of an offense, and be subject to a fine of from $100 to $1,000, and a penalty of from $500 to $1,000 is recoverable from the railroad company for each such offense when the officer, agent, or employé acts in obedience to its direction. These are the things enumerated: Shall refuse to fill out and return any blanks required by the act, or refuse to answer any questions therein propounded, or shall give false answers to any such questions, or shall, upon proper demand, refuse to exhibit any book, paper, account, etc., in his possession or under his control. It is plain that none of these things are covered by the second condition of the bond. The fifty-third section provides that if the railroad shall violate any provision of the act, or shall fail or refuse to obey any lawful requirement of the commission or judgment or decree of the court, for every such offense such railroad shall forfeit to the state from $100 to $10,000.

It is probable that the penalties here provided for would not be covered by the bond, because the injunction is provided by law. The company would be availing itself of a lawful right, and, while so doing, it would seem that it could not at the same time be held for a violation of section 53 by a refusal to obey an order of the commission or a judgment or decree of the court. But, however this may be, the penalty condition of the bond has been eliminated by an amendment of section 33, adopted February 23, 1909. See Sess. Laws 1909, p. 163. So that the bond exacted can be no impediment of substantial moment standing in the way of the complainant obtaining a speedy and complete adjudication touching the reasonableness of the rates fixed by the commission.

But the railroad company is entitled to sue for relief against any unlawful order of the Railroad Commission in any court, state or federal, having jurisdiction, and it is said the penalties imposed by section 53 are so enormous as to deter the company from seeking relief in any court but that named in the act, and in the way prescribed. From a reading of the section, it will be seen that it is the railroad only that is amenable to the penalty prescribed, not its officers, agents, or employés. These functionaries of the railroad are made the representatives thereof for the purpose of fixing responsibility upon the railroads, so that in a case like the present the railroad would be chargeable with a violation of the act in failing to obey the order of the Railroad Commission requiring the revision of local rates within the state—one offense, not a repetition of offenses from day to day, or at

intervals, as long as the railroad continued in the refusal to obey the order. It would seem that such is the reasonable construction of the section. Being penal, it should receive a strict construction, and no accumulation of offenses should be carved out of it, unless they are created by the strict letter of the law.

Section 52, as I have shown, penalizes special acts only, which are enumerated in the section, none of which are involved by this controversy. Section 51 relates to the recovery of damages in treble the amount of loss suffered; but the railroad company is not penalized, except by the provisions of sections 52 and 53, and this latter section does not affect its agents and employés.

Now, it is urged that the case of Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, is decisive of the particular point here presented. The statutes under consideration in that case, however, were most severe and drastic. For a violation of the act, if by a natural person, a fine of from $2,500 to $5,000 was imposed for the first offense, and double that for each subsequent offense; and a like fine was imposed if the carrier was a corporation. Another section of the act fixed passenger rates at two cents per mile, and provided that any railroad company, or any officer or representative thereof, violating any of the provisions of the act, should be guilty of a felony, and subject to a fine not exceeding $5,000, or imprisonment in the state prison not exceeding five years, or both. Another section provided for the regulation of freight traffic, and made any violation of such regulation a misdemeanor, punishable by imprisonment in the county jail. It will be seen at once that there is no comparison between the penalties imposed by the Oregon statute and that of Minnesota, and the difference is so wide as to render the Young Case not authoritative here.

Nor do I think that the penalties imposed are exorbitant or burdensome for willful violations of the provisions of the act. They were designed to secure an enforcement of the law, and I discover no intendment to prevent the railroad companies concerned having ample recourse to any court having jurisdiction for relief.

The third of the federal questions urged, namely, that the effect of the commission's order will be to deprive the complainant of its property without due process of law, is consequential only depending upon the result of the other questions presented. If, having found against complainant's contention as to the questions discussed, it further appears that the rates established by the commission are not unreasonable, then there can be no taking of the complainant's property without due process of law.

This brings us to the ultimate question whether, under the allegations of the bill, it appears that the rates imposed by the Railroad Commission are unreasonable and unjust to the complainant company. There is a statement in paragraph 20 of the bill which is very significant. The allegation referred to is as follows:

"While the immediate effect of such order, Exhibit I, if it could be confined strictly to the state of Oregon, might leave your orator a fair income upon its entire business, nevertheless, if the rates attempted to be established by the said order, Exhibit I, be applied to the interstate business directly af-

fected thereby, and if the percentage of reduction effected by such order be applied to the local business of your orator in the states of Oregon, Washington, and Idaho, which local business is now being transacted upon rates higher than those fixed by tariff L—525, it would operate to confiscate the property of your orator and deprive it of property without due process of law, in violation of the Constitution of the United States, because such reductions would leave your orator without any fair net earnings upon its property."

This signalizes the particular theory upon which this suit is instituted. But the order has or can have no effect beyond the limits of the state of Oregon. It was not so designed, nor is such its operative force, except as it may affect interstate commerce incidentally merely. It is no purpose of the railroad commission act, nor of the order of the commission, that the rate fixed by the commission should be applied to interstate business, or any part or parcel thereof, nor to the business of complainant in Washington or Idaho, or elsewhere than in Oregon. That it may operate to affect incidentally interstate rates established, or the rates on complainant's lines in Washington and Idaho, is, as I have endeavored to show heretofore, not to the purpose. The question is: Are the rates established by the commission in Oregon, and for Oregon, and not beyond its confines, reasonable? That they are is practically admitted by the averment quoted, that the effect of the order, if confined to the state, might leave a fair income upon complainant's entire business. In other words, the pleader is not willing to negative the fact of reasonableness that attends the order by legal presumption. · Tested by the demurrer, the averment is to be construed most strongly against the pleader.

By paragraph 25 of the complaint it is averred that the rates fixed between Portland and The Dalles by L—525 are unreasonably low; that all the rates attempted to be established by the commission's order to points east of The Dalles are based upon the rates charged by L—525 between Portland and The Dalles, and the rate of increase in the rates to points east of The Dalles as fixed by the commission's order is unreasonably low, and has the effect of making the rates to points east of The Dalles unreasonably low, and unjust to complainant. This is merely argumentative, and sets forth no facts from which it might be deduced that the rates fixed by the commission were even unremunerative to the company. So of the further averments of the bill, as they pertain to the application of the commission's rates to the branch lines of the complainant. "It is a fact," says the pleader, "that such attempted adjustment of rates is arbitrary and unreasonable, and is founded upon no circumstance and condition affecting the cost of service to your orator or the value of the service to the public, and is unjust to your orator."

But the fault with the bill is that no facts are stated as to the cost of the service, or in any way indicating what it is worth to transport freight over the lines of the complainant between the points designated, and the court is, therefore, unable to say from the bill that the rate fixed by the commission is unreasonably low. Especially are these and similar averments insufficient, when read in view of the particular theory upon which the suit is instituted.

Based upon the foregoing considerations, the demurrer to the bill should be sustained, and the preliminary restraining order should, consequently, be dissolved.

It is proper to say further, however, that I have carefully examined the affidavits and showing made for a continuance of the injunction, and I am of the firm opinion that the proofs are wholly insufficient to overcome the prima facie case that attends the order of the commission, supported by the ample showing of the defendants.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes