THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* MORRIS S. TREMAINE, as Comptroller of the State of New York, Defendant.

Third Department, June 21, 1929.

*Hamilton Ward, Attorney-General* [*Nathan L. Miller, John Knight* and *C. T. Dawes, Solicitor General,* of counsel] for the plaintiff.

*William D. Guthrie* [*Edward G. Griffin* of counsel], for the defendant.

Davis, J. The questions presented here represen⊍ one phase of the ceaseless controversy between departments of government jealous of their respective prerogatives and resentful of any real or fancied invasion or usurpation of rights deemed to be vested solely in one or the other. Such differences have existed from the earliest days of our constitutional government. (See 3 Beveridge, Marshall, chaps. 2, 3; *Marbury* v. *Madison,* 1 Cranch, 137; Randall Const. Prob. under Lincoln, p. 51 *et seq.*)

The differences which have arisen between these parties relate to the executive budget and certain lump sum appropriations made by the Legislature, and involve constitutional powers and rights. In brief, there is conflict between executive and legislative prerogatives. It is first necessary to state as briefly as possible the facts leading up to the questions in difference between the parties.

In 1925 the Constitution was amended to provide for the reorganization of the State Departments, creating and limiting in number the civil departments and determining their functions (Art. V); and again in 1927 to provide for an executive budget and the procedure of its submission to the Legislature and the action of that body thereon (Art. IV-A).

The first executive budget under the Constitution was submitted to the Legislature on January 28, 1929. Accompanying it, as the Constitution requires, was a bill for all proposed appropriations. The budget was itemized but the bill made lump sum appropriations for certain departments. In the bill was a provision which stated in substance that the head of the particular department should file with the Governor a tentative segregation of the amount appropriated; that before any liabilities should be incurred such segregation must be approved by the Governor; and no change should be made in the tentative segregation during the fiscal year without his approval. Segregation means a statement in considerable detail of the precise purposes for which the money appropriated is to be used. The parties are in agreement as to the legality of lump sum appropriations, and that the power to segregate may be delegated.

The Legislature did not adopt the proposal of the Governor that

he alone should have control of the segregation. It struck out that provision, restated the items, and clauses were inserted providing that the chairman of the finance committee of the Senate and the chairman of the ways and means committee of the Assembly should participate with the Governor in the segregation of certain appropriations. In part this purpose was to be accomplished under an already existing statute — to wit, section 139 of the State Finance Law, which applied where departments were being reorganized, and in part by the insertion of provisions following the particular appropriations.

The Governor refused to approve any lump sum appropriations to which such conditions were attached. He then sent to the Legislature two supplemental budget bills. One contained many lump sum appropriations, again with a provision giving to himself the sole power of segregation; the other with the appropriations largely itemized. The Legislature acted on this second bill by approving to a large extent the portions itemized but making lump sum appropriations to the Departments of Law and Labor, stating in the bill that it was to permit the reorganization of the respective departments with the evident intent that section 139 of the State Finance Law should apply, and the segregation should be made by the Governor and the chairmen of the committees previously named. In other lump sum appropriations where section 139 would not apply, provisions were added requiring segregation with the approval of the same three officials when any part of the appropriation was to be used for personal service. This bill is now chapter 593 of the Laws of 1929. There were other statutes making appropriations passed the same year which present practically the same questions. As a decision in one instance will determine the principle governing all, it is not necessary to refer to them at length.

As has been stated, lump sum appropriations were made to two departments for reorganization. When the bill was returned to the Governor, he approved the lump sum awards, but stated that section 139 of the State Finance Law was unconstitutional. As to the general segregation clauses, the Governor expressed his disapproval of several of these; and whether that amounted to a veto is one of the questions to be determined.

There could be no legal expenditure or disbursement of the appropriations in question without, *first*, proper segregation, and *second*, the audit of disbursement items by the Comptroller. In the statement of facts agreed upon and submitted, it appears that the Comptroller " intends and threatens to audit all vouchers duly presented to him for personal service or otherwise covered

by and relating to any and all of the above-mentioned appropriations and to issue his warrants for the payment thereof without any certification to him of the approval of segregations thereof by the chairman of the finance committee of the Senate and the chairman of the ways and means committee of the Assembly, * * * but solely upon the segregation, approval and certification by the Governor alone or in conjunction with other executive officers when so required by law."

The plaintiff, claiming these acts are illegal, demands judgment that the provisions of law requiring approval of the chairmen named be adjudged valid and binding on the defendant, and the determination that his duty requires compliance therewith, and that he be enjoined from auditing vouchers and issuing warrants except upon filing with him all certificates of segregation as prescribed by the Legislature. The defendant asks judgment approving his intended acts as legal, and that the certificate of approval of the Governor alone be determined as sufficient, and that the claim and contention of the plaintiff be dismissed.

By brief and argument the controversy seems narrowed to two primary questions: (1) May power be delegated by the Legislature to two of its officers to participate with the Governor in approving segregation of lump sum appropriations, or performing similar duties in matters incidental to appropriations not amounting to disbursement? (2) May the Governor disapprove a condition or limitation constituting part of an appropriation bill without disapproving the entire item?

The answer to the first question involves the constitutionality of section 139 of the State Finance Law and of clauses of similar import in the Appropriation Bill as enacted. The plaintiff sustains the constitutionality of these laws. The defendant challenges their validity, asserting that such duties may not be delegated to legislators, and that now the Governor alone may approve segregations through power derived from section 41 of the State Departments Law (added by Laws of 1926, chap. 546, as amd. by Laws of 1927, chap. 364).

There is suggestion also in the brief of defendant that section 139 is not applicable where lump sums were appropriated for the reorganization of departments, for there could legally be no reorganization, and also with respect to part of an appropriation to the Department of Law because it was a reappropriation not available " during the first fiscal year thereafter." But we find nothing in the record making those questions controversial, or in our opinion furnishing basis for a decision, nor do they bear in any material way upon the main questions to be decided.

The claim of the defendant is that members of the Legislature may not under the Constitution perform what are called administrative duties or hold other offices. At different times in messages to the Legislature, the Governor raised not only the question of constitutionality, but made objection to the granting of power to the chairmen for practical reasons of undivided responsibility, good business policy, and the prevention of delay. We are, of course, not concerned with the wisdom, propriety or disadvantages of the legislation, but only in its constitutional implications.

It is urged that the Constitution, as amended, has now made such complete definition of the executive powers that there can be no possible intrusion into the field of executive rights and duties· by any other department. As applied to this case, it is asserted that the designation of a member of the Legislature to perform any executive or administrative act is forbidden, and the attempted delegation of such powers to him are void. We find no fundamental change in the Constitution in this respect. Whether or not Constitutions contain express provisions conferring general powers on each department, " it is implicit in all, as a conclusion logically following from the separation of the several departments." (*Springer* v. *Philippine Islands,* 277 U. S. 189, 201.) We understand there is no dispute that the duty of segregation may be delegated to any administrative officers. (See Governor's Message of March eighteenth.)

The division of powers of government between the three departments is general. The history of practical experience in government indicates that it has not been possible to separate and identify the duties pertaining to the different departments so that they remain at all times entirely distinct. There is no doubt that the framers of the Federal Constitution and those who wrote some of the early State Constitutions had in mind the theory of complete, definite division of the functions of government, and sought to commit them respectively to the legislative, executive and judicial departments. They were students of the works of political philosophers of whom Aristotle and Montesquieu were types. They were familiar with the theories of Blackstone concerning the division of powers under the English Constitution, which later were found to be fallacious. Philosophical and scientific theories gave way in the adaptation of government to practical necessities. The general principle has been in no respect impaired where definite powers were conferred (*Springer* v. *Philippine Islands, supra*); and where they may be clearly implied there has been no serious encroachment by one department upon another. But at best, there have always been instances where the strict line

of demarcation was not kept clear or stable — sometimes by reason of authority conferred, and sometimes in the absence of express authority. So, the executive with the power to recommend, approve and veto legislation performs limited legislative duties. In granting pardons to those convicted in the courts, his acts are in a sense judicial. In the performance of their ordinary duties, administrative officers must often by necessity make interpretation or construction of laws (as the Governor, Comptroller and Attorney-General have done in this case), but it is not regarded as an invasion of judicial powers. The Legislature has often made appointments to office and has provided methods extra-judicial for the collection of taxes. In this State for a time the Senate was a part of the highest court of appeal, and it now forms part of the court for the trial of impeachments. Senators have acted on commissions to negotiate treaties of peace. Courts are called upon to perform duties not strictly judicial. They make rules of practice to supplement statutory procedure. A judge may not have delegated to him by the Governor the performance of duties of administrative character except those incidental to judicial functions; but the President has recently appointed Federal judges on the Commission for Law Enforcement. All this may illustrate the difficulty of making exact, scientific cleavage between the duties of officers of the respective departments, so readily separated by general statement. (*Murray* v. *Hoboken Land & Imp. Co.*, 18 How. [U. S.] 272, 284; *Oregon R. & Navigation Co.* v. *Campbell*, 173 Fed. 957, 968; *Village of Saratoga Springs* v. *Saratoga Gas, etc., Co.*, 191 N. Y. 123, 132; *Stanton* v. *Board of Supervisors*, Id. 428, 433; *Matter of Richardson*, 247 id. 401; Story Const. U. S. [5th ed.] § 525; Cooley Const. Lim. [8th ed.] 213 *et seq.;* Willoughby Const. U. S. [2d ed.] §§ 1058, 1061, 1062; Bryce Am. Com. chap. 21.)

Constitutional provisions represent to a large extent social and economic purposes. They are something more than dry, abstract rules. They become readily adaptable to the necessities of the period, in war or in peace. (Randall Const. Prob. under Lincoln, p. 2 *et seq.*) There has been great development of governmental powers to meet new, constantly changing and complex conditions in our social, economic and industrial life, and in the development of means of communication and transportation — so that the border line of powers and duties theoretically assigned to different departments tends to become more shadowy and indistinct. In many instances these powers coalesce. " No doubt there are peripheral zones where the judicial and the administrative merge into each other. * * * The hinterland may be plain when the frontier is uncertain." (*Matter of Richardson, supra,* 413.) So it

may be with the legislative and executive. Then is required at times what has been called " a wise and commendable forbearance in each of these branches from encroachments upon the others " (*Kilbourn* v. *Thompson*, 103 U. S. 168, 191), and a fair spirit of mutual accommodation and tolerance when the public interest is to be served. (*Brown* v. *Turner*, 70 N. C. 93, 95, 102.) Jefferson had no known legal or constitutional authority to purchase Louisiana. So, methods are often employed in cases of necessity that appear to the philosopher as extra-legal. In the practical operation of governments to obtain beneficial results, scientific theories of departmental prerogative are sometimes abandoned. The general policy has been not necessarily to approve but to accept.

We share the doubts of counsel as to the precise character of the acts to be performed in approving segregations. It is often difficult, as we have indicated, to decide whether the exercise of a particular power is solely legislative or executive in its nature. Certain duties may readily be classified. Appropriation is clearly legislative. The letting of contracts and the expenditure of money are as clearly administrative. The Legislature could have made its own segregation by adding items in detail subject, of course, to the veto of the Governor. It has been learned by experience that in many enterprises such itemization results in confusion and embarrassment through non-availability of items because of changes in conditions subsequently arising. So lump sums are appropriated with the power delegated to officers to segregate in order to complete the purpose of appropriation. The power was here delegated to the Governor and the two chairmen — all of whom, under the Constitution, were given duties respecting the budget; and all of whom naturally had reason to be more familiar with the fiscal policies of the State, necessary appropriations and their allocation than any other persons. If the duty be legislative, then the Governor is acting in that capacity; if it be called administrative, then the chairmen are sharing it with him. Perhaps the duty falls within the twilight zone where the function is legislative and the act of approval is administrative, and exact classification is unnecessary. It might be designated as a deferred legislative act in aid of the performance of functions which the Legislature might fully have performed originally, properly delegated to officers acting in an administrative capacity. (*Wayman* v. *Southard*, 10 Wheat. 1, 43.) The legislation was complete, but the distribution for particular purposes was made by heads of departments with the approval of the Governor and legislative officers — furnishing a system of check and balance. The duties of the chairmen being in further-

ance of the legislative plan are not necessarily illegal because they involve administrative functions. The Legislature is not acting in a body nor are these chairmen acting as legislators in performing their duties.

The legislative power is plenary except for such restrictions and prohibitions as are contained in the Constitution; and every act passed must be presumed to be in harmony with the fundamental law in the absence of clear reasons for a contrary view. (*People ex rel. Peaks* v. *Voorhis*, 243 N. Y. 420; *People ex rel. Simon* v. *Bradley*, 207 id. 592.) In determining the constitutionality of any statute the practice and acquiescence under it for a period of several years is entitled to great weight. "It is a contemporary interpretation of the most forcible nature." This has been the doctrine from early constitutional history. (*Stuart* v. *Laird*, 1 Cranch, 299, 309; *City of New York* v. *New York City R. Co.*, 193 N. Y. 543, 549; *People ex rel. Cotte* v. *Gilbert*, 226 id. 103, 107; *Union Ins. Co.* v. *Hoge*, 62 U. S. [21 How.] 35, 66; *Myers* v. *United States*, 272 id. 52, 175.)

It is perhaps unnecessary to give the history of budget legislation. As a policy it first began to be discussed in this State about 1910. There was legislation in that year and in 1913 designed to limit to some extent the system of making unscientific and unrelated appropriations without regard to need or economy. Boards and departments were created to make study of needed appropriations and make recommendations and estimates. Officers of the Legislature were with executive officers members of the Board of Estimate. The budget was a matter of serious consideration in the Constitutional Convention of 1915, and provisions for an executive budget were inserted in the proposed Constitution which eventually failed of adoption. Thereafter, by other legislative acts, a "statutory budget" was undertaken. Power of approval of segregation of appropriations was given to the Governor and the two chairmen. Without enumerating the changes in the statutes, we may say that section 139 of the State Finance Law originated in chapter 336 of the Laws of 1921 (§ 54-b), which created the Board of Estimate and Control, and has since been in force without substantial change. During the administrations of the two preceding Governors, millions of dollars have been allocated to different departments by the approval of segregation by the Governor and the two chairmen. The practice has continued until the present time. In his message of February twenty-seventh the Governor says: "It is true that this practice of requiring segregation approval by these two gentlemen and the Governor has been used in this State since 1921, and the constitutionality of it was apparently not questioned

because the State was going through a transitional preparation period for the constitutional reorganization." There might be difference of opinion as to the reasons, but we accept the fact commonly known that the constitutional question has not been raised in the years that have passed. In many other instances, not necessary to recite in detail, officers of the Legislature have been for many years by statutory designation members of boards and commissions performing many administrative functions, holding no new office, but acting *ex officio;* and their constitutional right to so act has been unquestioned. In at least three cases in the courts, there have been controversies with boards where one or more of the members were legislative officers acting in an administrative capacity, and the constitutional right of those officers to so act has not been challenged. (*People ex rel. Broderick* v. *Morton,* 156 N. Y. 136; *People ex rel. Heinrich* v. *Travis,* 175 App. Div. 721; *Nellis* v. *State of New York,* 204 id. 176.) When the amendments of the Constitution of 1925 and 1927 were passed by the Legislature and submitted to the vote of the people, section 139 of the State Finance Law was then in force and it is not likely that any large number of persons then questioned its constitutionality or anticipated that the new Constitution would by its own force affect this legislation. There has been long acquiescence in and practical construction of laws which have authorized legislators to serve in similar administrative capacities. We find no positive inhibition to prevent the performance of the duties here under consideration. The legal right exists, and the wisdom and propriety of the policy, we repeat, is not a subject for discussion here. The State Finance Law was a general act and it has not been repealed or made inoperative by the adoption of the constitutional amendment (Art. IV-A).

The constitutional inhibition (Art. III, § 7) providing that " No member of the Legislature shall receive any civil appointment within this State * * * from the Legislature * * * during the time for which he shall have been elected; and all such appointments and all votes given for any such member for any such office or appointment shall be void," has, in our opinion, no application here. No votes have been cast for these chairmen for the position in which they are called upon to act, nor have they had appointment to any new office. By legislative act additional and increased duties (*Shoemaker* v. *U. S.,* 147 U. S. 282) have been delegated to them in respect to appropriations — and that is all.

The remaining question pertains to the disapproval by the Governor of certain provisions of the Budget Bill passed by the

Legislature of which section 11 (appended to the construction appropriation items) is typical. That section provides, so far as material: " No part of any appropriation made by this act for construction shall be expended for personal service except on the approval of the governor, the · chairman of the senate finance committee and the chairman of the assembly ways and means committee. .This provision may be complied with by the filing with the comptroller and the department of civil service of a list of the positions so approved. and the time for which any person may be employed in such position.  *  *  *."

The Legislature must act on the appropriation bills proposed by the Governor before considering further appropriations; and it may not alter such bill except to strike out or reduce items therein. It may add items of appropriation by stating such additions separately and distinctly from the original items of the bill, if each is made to refer to a single object or purpose. (Const. art. IV-A, §§ 3, 4.) If any bill is presented to the Governor containing " several items of appropriation of money, he may object to one or more of such items while approving of the other portion of the bill." (Const. art. IV, § 9.) The reference in the Constitution is to " items of appropriation " and " items of appropriation of money." We think that section 11 is not an " item " in the sense in which that term is used in the Constitution. We believe the power to veto a part of a bill is strictly limited to the items of appropriation of money, and does not extend to clauses, sentences or sections containing limitations or conditions under which the appropriation may be made available. If the power existed, as has been said in another jurisdiction, " The executive alone would make that law which had never received the legislative assent." (State v. Holder, 76 Miss. 158.) The Governor had the undoubted right to veto any item which included such conditional clauses, deemed by him unwise or illegal, but he had no right to strike out separate clauses of limitation which were integral parts of the bill and .retain the appropriation to be disposed of in some manner other than that the Legislature had in mind when it was made. His act in that respect was void.

From what has been said, we think the conclusion follows that section 139 of the State Finance Law and kindred provisions are not unconstitutional because they permit the performance of duties in their nature administrative by the chairmen of the legislative committees; that said section has not been repealed or made inoperative by the adoption of subsequent constitutional amendments, and its terms are in general applicable to the segregation of lump sum

appropriations to the two departments mentioned; that there was no power of separate veto by the Governor of section 11 of the bill, and his action thereon was void, and the provisions of that section are applicable to the items to which they relate.

Judgment should be directed for plaintiff as demanded in the agreed statement of facts.

HILL and HASBROUCK, JJ., concur; HINMAN, J., dissents in part with an opinion; VAN KIRK, P. J., agrees with Justice HINMAN's views as to " section 11 " but thinks they go to form of procedure and that the act has produced the same result that could have been produced in strict conformity with the Constitution; that the real issue here is in respect to the method for segregation, and thus he concurs with Justice DAVIS.

HINMAN, J. (dissenting in part). The second lump sum appropriation for the Law Department, making a reappropriation of $293,820.93, being " the balance of unexpended moneys appropriated by chapter 75 of the Laws of 1928, Part I * * * for the remainder of the fiscal year ending June 30, 1929," cannot be said to have been appropriated for maintenance and operation, or for personal service " during the first fiscal year thereafter," and, therefore, this item is clearly not within the purview of section 139 of the State Finance Law, because the first fiscal year after the enactment of chapter 593 of the Laws of 1929 will not begin until July 1, 1929.

As to section 11, relating generally to construction items of appropriation wherever personal service is involved, I cannot agree with the conclusion of Mr. Justice DAVIS. I do agree that the Legislature has the right to add a condition to a new item of lump sum appropriation as to the manner of segregating that appropriation. Such a conditional clause would be germane to the item of appropriation. It would not introduce a new subject into the Appropriation Bill in violation of section 22 of article III of the State Constitution. It would be an essential part of the new legislative item of appropriation and the item should be acted upon by the Governor as a whole. That presupposes, however, that the Legislature has complied with the Constitution in the matter of setting up the new item. The form of the new item of appropriation is an essential upon which its validity may depend. " The Legislature *may not alter an appropriation bill submitted by the Governor except* to strike out or reduce items therein, but it may add thereto items of *appropriation* provided that such additions

are stated *separately and distinctly from the original items of the bill and refer each to a single object or purpose."* (State Const. art. IV-A, § 3.) The Legislature did not strike out of the Governor's bill the construction items proposed by him and did not add " separately and distinctly " from his original items a series of new items, each referring " to a single object or purpose " and each with a conditional clause attached. What the Legislature did was to leave the Governor's construction items in the bill and added more of such items and then at the end of the bill inserted in section 11 a conditional clause referring generally to all of such items as involved expenditures for personal service. Unless the Legislature made new items, each complete in itself so far as it related to a single object or purpose, and separately stated from the original items of the bill, in conformity with the constitutional requirement, there was a void alteration of the bill by the Legislature as to such original items. The Legislature may not alter the bill except to strike out or reduce items or add new items in the precise manner provided by the Constitution. It is my opinion that the construction items proposed by the Governor which were not struck out by the Legislature became the law without reference to section 11 or the act of the Governor in vetoing that section. I also hold that the construction items added by the Legislature did not become the law to the extent of authorizing expenditure for personal service, because so far as such items involve such expenditure they have not received legislative assent apart from the conditional clause added by section 11 of the bill and such clause cannot be given effect because not made an integral part of the item of appropriation for each single object or purpose. The Legislature had the right to accomplish the full purpose of the provisions of section 11 of the bill, both in relation to the Governor's original items and the items added by itself, but having failed to act in the only way permitted by the Constitution, its abortive attempt to act did not require approval or disapproval of the Governor.

Otherwise I agree with the conclusions reached by Mr. Justice DAVIS.

The court finds the facts as stipulated, and judgment is directed for plaintiff as demanded in the agreed statement of facts.

Leave to appeal to the Court of Appeals granted.